James M. MORRISSEY and Ralph Ibrahim, Individually and on behalf of the members of the National Maritime Union of America, Plaintiffs,

v.

Joseph CURRAN, as President of the National Maritime Union of America and Individually, Shannon Wall, as Secretary-Treasurer of the National Maritime Union of America and Individually, Mel Barisic, Rick S. Miller, James J. Martin, Peter Bocker, Leo Strassman, Robert Nesbitt, William Perry, Abraham E. Freedman, Martin Segal and Leon Karchmer, Individually, Defendants.

No. 73 Civ. 204 (WCC).

United States District Court,
S. D. New York.

July 27, 1979.
Opinion and Order Dec. 19, 1979.

Duer & Taylor, New York City, for plaintiffs; Arthur E. McInerney, New York City, of counsel.

Feder, Kazovitz & Weber, Hale, Russell, Gray, Seaman & Birkett, New York City, for defendant Curran; Francis J. Dooley, Orange, N. J., Thomas E. Engel, Selvyn Seidel, New York City, of counsel.

Evans, Koelzer, Marriott, Osborne & Kreizman, Red Bank, N. J., for defendants Wall, Barisic, Martin, Miller, Strassman, Nesbitt and Bocker; George J. Koelzer, Joel N. Kreizman, Red Bank, N. J., of counsel.

Waldman & Waldman, New York City, for defendants Wall, Barisic, Miller, Martin and Bocker; Seymour M. Waldman, New York City, of counsel.

Duane, Morris & Heckscher, Philadelphia, Pa., for intervenor, Edward Pogor; Thomas P. Preston, Philadelphia, Pa., of counsel.

## OPINION

CONNER, District Judge:

This is an action under Section 501 of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 501, brought by two members of the National Maritime Union ("NMU" or "the Union") against past and present officers of the Union and trustees of its Officers' Pension Plan ("OPP") charging various breaches of fiduciary duties, principally in the payment to or for certain officers of unauthorized or excessive salaries, pensions, severance pay and other benefits.

## Procedural Background

As a prerequisite to this action, 29 U.S.C. § 501(b), plaintiffs on August 2, 1971 wrote to the defendant officers of the NMU, requesting the filing of an action for an accounting of the NMU general fund and pension plan and to recover damages for the losses sustained as a result of breaches of fiduciary duty by the officers "in that they did suffer and permit expenditures of moneys from the NMU general fund which expenditures were not for the benefit of the organization and its members" and by the trustees "in that they did permit expenditures of moneys from the [maritime Union Pension] Plan, which expenditures were contrary to the terms of the Plan and not for the benefit of the participants of said Plan." The letter set forth a number of specific examples of the alleged breaches, adding that they were "merely illustrations and your actions should not be limited to recovery solely of these items" but of all losses "discovered or discoverable in the necessary accounting proceedings."

When, as expected, no action resulted, plaintiffs applied to this Court, pursuant to Section 501(b), for leave to bring suit. On January 9, 1973, Judge Robert L. Carter granted leave to commence a proceeding, *inter alia,*

"1. For an accounting of the general funds of the NMU;

\* \* \* \* \* \*

"3. For an accounting of the NMU Officers' Pension Fund;

"4. For damages, injunctive and other appropriate relief against the defendants with relation to the breaches of their fiduciary duties under Title 29 U.S.C. [§] 501 \* \* \*."

The original Complaint charged thirteen specific violations of trust and, by a memorandum and order dated February 25, 1975, 76 CCH Labor Cases ¶ 10,695, the Court granted leave to file an Amended Complaint alleging six more.

The action went to trial on February 23, 1976. After two trial days, plaintiffs rested and defendants moved orally to dismiss the Complaint for failure to make out a *prima facie* case. In the ensuing discussion, plaintiffs' attorney indicated that he had been hampered in preparing for trial by the Union's delay in producing documents and that he had wished to take additional testimony but had been unable to obtain service of subpoenas on the witnesses. The Court, remarking that valuable rights of Union members should not be lost through inadequate trial preparation, adjourned the trial to afford plaintiffs' counsel a further opportunity to put their case in order. To accommodate defendants' counsel and witnesses, defendants were allowed to proceed with the beginning part of their case the following day.

The second and final installment of plaintiffs' main case was presented from April 19 through April 21, 1976. At its conclusion, defendants renewed their motion to dismiss. Because plaintiffs' case had been presented in a somewhat disorderly fashion, the Court asked plaintiffs to submit a written statement, supported by citations to the record, setting forth what they believed their proofs had shown, and defendants were asked to file written answering statements.

In their memorandum, plaintiffs asserted that the proofs established that defendants had breached their fiduciary responsibilities in eight respects. In an unreported Memorandum and Order entered May 19, 1977, the Court dismissed the Complaint as to three of the eight, leaving in the case the following five claims:

1. that defendant Joseph Curran, retired president of the NMU, was paid a salary that was unauthorized and excessive;

2. that the defendant officers had received unauthorized cash payments in lieu of vacations;

3. that NMU funds had been used to pay personal expenses of the defendant officers;

4. that the OPP (and its successor plan) were overfunded and that they provide excessive pensions; and

5. that NMU general funds had been transferred to the "Fighting Fund" and used to make political contributions.

The remainder of defendants' case was put on in two sessions, the first covering November 31 to December 3, 1977, and the second January 18 and 19, 1978.

From a study of this additional evidence, it appeared that the Court's dismissal of the plaintiffs' claim that "excessive" severance pay had been given to the retired officer defendants was too sweeping in its terms. That dismissal was expressly based upon the Court's determination that the NMU's scheme of giving severance pay in an amount equal to one month's pay for each year of employment had been authorized by the membership and that plaintiffs had failed to establish "that the membership authorization was obtained in any improper manner or that the authority conferred was somehow exceeded." Upon a review of the full record and briefs, it appeared that, at least in the case of Joseph Curran, and perhaps others as well, the authority conferred had apparently been exceeded by giving severance pay in amounts above the authorized rate.

Because the Court's unqualified dismissal of this claim at the close of plaintiffs' case might have caused defendants to fail to introduce in their case available evidence tending to show that the severance payments were within the authorized limit, the Court, to avoid prejudice to defendants, notified counsel at a conference on December 15, 1978, that it was modifying its previous Order to the extent of reinstating plaintiffs' claim of excessive severance payments, but would afford defendants the opportunity to introduce additional evidence in opposition to that claim. Defendants have not elected to avail themselves of that opportunity and therefore stand on the present record.

This Opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

#### THE PARTIES

The NMU is a labor organization as defined in 29 U.S.C. § 402.

Plaintiffs James M. Morrissey and Ralph Ibrahim are and have been since before 1950 members of the NMU. Morrissey has been a repeated unsuccessful candidate for the offices of President and Secretary-Treasurer, and a perennial and highly vocal dissident. In addition to speaking out at port meetings and conventions of the NMU, Morrissey has published a paper named "The Call," charging the incumbent administration with various improprieties, including many of the violations of trust alleged in this action, which is but one of a series of actions he has brought against Curran and other Union officers. See, e. g., Morrissey v. Curran, 483 F.2d 480 (2d Cir. 1973), cert. denied, 414 U.S. 1128, 94 S.Ct. 865, 38 L.Ed.2d 752 (1974); Morrissey v. Curran, 356 F.Supp. 312 (S.D.N.Y.1973); Morrissey v. Curran, 76 Civ. 738 (RJW), U.S.D.C., S.D. N.Y.

Defendant Joseph Curran was one of the founders of the NMU and its President from 1938 until his retirement on March 1, 1973. Defendant Shannon J. Wall has been President of the NMU from March 1, 1973 to date; he was Secretary-Treasurer from 1966 to 1973 and Vice President from 1961 to 1966. Defendant Mel Barisic was Secretary-Treasurer of the NMU from March 1, 1973 until his retirement on February 28, 1978, having been an employee of the Union for a total of 27 years.

Defendants Rick S. Miller, James J. Martin, Peter Bocker, Leo Strassman and Robert Nesbitt are and were at all relevant times Vice Presidents or National Representatives of the NMU. Defendants Strassman and Nesbitt were apparently not personally served and have not voluntarily appeared; accordingly, they will not be bound by the judgment herein.

Defendant William Perry was Assistant to the President of the NMU from 1958 until he was discharged on January 16, 1969.

Defendants Abraham E. Freedman, Martin E. Segal and Leon Karchmer were trustees of the OPP until it was supplanted by

the Staff Pension Plan ("SPP") effective January 1, 1974. Defendant Amalgamated Bank, which was added by amendment, is trustee of the SPP.

The Court has jurisdiction of the action under 29 U.S.C. § 501. *Morrissey v. Curran, supra,* 483 F.2d 480.

## HISTORICAL BACKGROUND

The NMU was founded in 1937 following a walkout of the crew of the passenger ship PENNSYLVANIA in protest against what were perceived as grossly inadequate wages ($62.50 a month on the East Coast and $67.59 on the West Coast) and intolerable working conditions. Joseph Curran, a boat deckman and ship's delegate on the sister ship CALIFORNIA, whose crew soon joined the strike, was a prime mover in the founding of the Union, became its first President in 1938 and held the office for 35 years until his retirement in 1973.

In large measure due to the efforts of the NMU and its rival labor organization, Seafarers' International Union, the pay of American merchant seamen has risen spectacularly through the years, even while their working conditions were substantially improved. Thus, under the NMU's 1977 contracts, an able-bodied seaman on a mechanized ship was paid $984.65 per month plus overtime at a rate of $7.22 per hour.

Curran was regarded by many NMU members, not without some justification, as the chief author of this dramatic improvement in the lot of seamen. Curran understandably became their hero, and their adulation of him approached idolatry.

However, these economic blessings turned out not to be unmixed. The effect of the enormous increase in labor costs for U.S.-flag ships, coupled with the freedom of foreign-flag ships from costly compliance with stringent U.S. safety regulations, placed the U.S.-flag ships at an almost insuperable competitive disadvantage, and inexorably produced a drastic decline in the U.S. merchant fleet, to the point where only approximately 6% of the U.S.-foreign shipments are currently carried in U.S.-flag vessels. The membership of the NMU dropped from approximately 50,000 in 1959 to less than 15,000 today. Even the latter number is deceptively high; there are actually only about 6,500 jobs currently available on ships under contract to the NMU. To spread the work, no member is permitted to start a voyage in a year in which he has completed 210 days (7 months) of work. At any given time, over half of the NMU members are idle.

Despite an increase of the annual dues in 1976 from $160 to $240, the NMU has run at an annual deficit averaging over half a million dollars every fiscal year since 1972, with the exception of the fiscal year ending June 30, 1974, when the NMU realized some $6,000,000 from the sale of a building in New York City.

## ORGANIZATION OF THE NMU

The organization of the Union was described in our Memorandum and Order of May 19, 1977, and was succinctly summarized in *Morrissey v. Curran,* 423 F.2d 393, 395 (2d Cir.), *cert. denied,* 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796 (1970):

"The structure of the NMU and the powers and duties of its officers and various internal governing bodies are set out in the Union's constitution. It makes provision for three governing units which have nation-wide jurisdiction. The ultimate authority is vested in the National Convention, which meets triennially and is composed of the elected delegates from various ships and ports. When the National Convention is not in session, the Union is governed by the National Council, which holds regular annual meetings and consists of the elected national officials and certain other delegated representatives. When the National Council is not in session, governing authority rests in the National Office, made up of the national president, secretary-treasurer, three vice presidents, and three national representatives. This body is primarily responsible for the day to day, internal administration of NMU affairs."

With respect to officers' compensation, Article 14, § 1(a) of the 1960 and 1965 NMU Constitutions provided:

> "The National Council shall fix the salaries for all officers of the Union, subject to approval as provided by this Constitution."

In 1972 this section was amended to read:

> "The National Council shall establish the rates of compensation, including pension, welfare and other fringe benefits for all officers of the Union, subject to approval of a majority of the total members voting at regular membership meetings."

## APPLICABLE LEGAL PRINCIPLES

The LMRDA was enacted as

> "a response to the disclosure of official pilfering, union violence and the use of union office for personal profit during hearings held by the Select Committee on Improper Activities in the Labor or Management Field chaired by Senator McClellan. S.Rep. No. 187, 86th Cong. 1st Sess., 2 U.S.Code Congressional and Administrative News 2318 (1959). To expose conflicts of interest and stamp out embezzlement and self-dealing by union officials, the Act required unions to comply with certain reporting and disclosure requirements, established new crimes, and codified the fiduciary obligations of union representatives. See Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819 (1960)."

*McNamara v. Johnston*, 522 F.2d 1157, 1163 (7th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976).

Section 501 "was a direct and far-reaching response to the mischief exposed and dramatized by the McClellan Committee. That mischief was the misuse of union funds and property by union officials in its every manifestation. Thus the reach of Section 501 extends to every area in which subversion of the interests of the union membership may be accomplished by union officials or representatives bent on acting in culpable derogation of those interests."

*Hood v. Journeymen Barbers, Hairdressers, etc.*, 454 F.2d 1347, 1354 (7th Cir. 1972).

> "The content of the fiduciary obligation in Section 501(a) is outlined only in broad principles. Professor Cox has authoritatively stated that 'The principles stated in section 501(a) were drawn from the Restatement of Agency in an effort to incorporate the whole body of common law precedent defining the fiduciary obligations of agents and trustees with such adaptions [sic] as might be required to take into account "the special problems and functions of a labor organization * * *."' * * * At a minimum, there must be safe, honest, loyal, and conscientious management of the fund." *Id.* at 1355 (footnotes omitted).

But actions under Section 501 often do not involve outright embezzlement. Frequently, as in the case of some of the expenditures challenged here, the accused officers can point to an express or implied authorization thereof by either the Constitution or by-laws or by a vote of the members.

 At least in cases where self-dealing is not involved, and where the disbursement produces some apparent union benefit, authorization is a defense to an action under Section 501. Indeed, during the hearings on LMRDA, Senator John F. Kennedy stated:

> "Union officers will not be guilty of breach of trust under this section when their expenditures are within the authority conferred upon them either by the constitution and bylaws, or by a resolution of the executive board, convention or other appropriate governing body—including a general meeting of the members—not in conflict with the constitution and bylaws." 105 Cong.Rec. 17900 (1959).

See also Office of the Solicitor, U.S. Dept. of Labor, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 1021 (1964).

In *McNamara v. Johnston, supra,* 522 F.2d at 1165–66, the Court of Appeals for the Seventh Circuit, drawing on common-law principles of agency, ruled:

. "[F]undamental fairness requires, that as between agent and principal, an agent cannot be held liable for the use of the principal's property in an unlawful manner when it is reasonable to infer that the principal authorized the agent's conduct. * * * [S]o long as the expenditures were authorized in some fashion, plaintiffs can have no cause of action on behalf of the union for breach of fiduciary duty." (Footnotes omitted.)

And in *United Mine Workers of America v. Boyle*, 91 L.R.R.M. 2549, 2551 (D.D.C. 1975), the court ruled:

"[I]t is clear that the plaintiff has the dual burden of establishing (1) that the expenditure was not properly authorized, and (2) either that union assets were converted to an individual's own use, or that the union had been deprived of the benefit of the funds involved." (Footnote omitted.)

However, in *United States v. Silverman*, 430 F.2d 106, 114 (2d Cir. 1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971), the Court of Appeals for the Second Circuit stated:

"It is clear that when there is no possible union benefit from the use of the union funds made by the official, it makes no difference whether the use was authorized. Thus, in *United States v. Dibrizzi*, 393 F.2d 642 (2d Cir. 1968), the jury could have found that the expenditures 'were personal non-business expenses and in no way incurred in furtherance of the union's business.' Our court stated that:

'Even if appellant may have established that his expenses were, as he claims, authorized and adopted by the union, such does not absolve him of his crimes * * *.' 393 F.2d at 645."

■ Although both *Silverman* and *Dibrizzi* involved prosecutions under 29 U.S.C. § 501(c), the criminal counterpart of Section 501(b), there is no apparent reason why the plaintiff's burden in a civil case seeking only a reimbursement of monies improperly expended should be greater than the government's burden in a criminal proceeding in which the union officials are exposed to the possibility of imprisonment for terms of up to five years on each count.

In *Puma v. Brandenburg*, 324 F.Supp. 536, 544 (S.D.N.Y.1971), notwithstanding the fact that the Officers' Pension Plan under challenge had been ratified by the union membership, Judge Pollack stated:

"However, merely because an Executive Board has the power to set officers' salaries (including pensions), does not mean that it has unlimited power to do so. Section 501 of the LMRDA imposes on labor representatives a fiduciary duty to the labor union and its members in respect of the management of union funds and other property. This fundamental obligation applies as well to the conduct of union representatives prior to the effective date of the LMRDA. Consequently, the terms of the instant Officers' Pension Plan must be inspected in the light of this fiduciary duty to determine whether the Plan was essentially fair or whether it was so over-generous or otherwise improper as to amount to a violation of trust."

And in *United States v. Ladmer*, 429 F.Supp. 1231, 1243 (E.D.N.Y.1977), Judge Dooling stated:

"[T]he essential difficulty with the argument for authorization is that formal resolutions cannot authorize the expenditure of the funds of labor organizations where the expenditures are not for union benefit but are for the personal benefit of the recipients."

The compensation of union officers falls in the hybrid class of expenditures that involve self-dealing (at least where the officers serve on the council or other body that fixes officers' salaries subject to membership ratification), but which also produce a Union benefit, since no labor organization can function effectively without competent leadership.

■ Where the Union members have expressly authorized a specific level of compensation for the officers, a court must be hesitant to substitute its judgment for that of the members, except where the autho-

rization was procured through fraud, mistake or duress or where the compensation so far exceeds the norm that fraud, mistake or duress can be inferred with some degree of assurance—that is, where the court can reliably conclude that the membership would not knowingly and freely have authorized such extravagant emoluments for its officers.

This is in keeping with the stricture of the Court of Appeals in *Gurton v. Arons,* 339 F.2d 371, 375 (2d Cir. 1964):

> "The provisions of the L.M.R.D.A. were not intended by Congress to constitute an invitation to the courts to intervene at will in the internal affairs of unions. Courts have no special expertise in the operation of unions which would justify a broad power to interfere. The internal operations of unions are to be left to the officials chosen by the members to manage those operations except in the very limited instances expressly provided by the Act. The conviction of some judges that they are better able to administer a union's affairs than the elected officials is wholly without foundation."

Although that statement was made in the context of an action challenging voting procedures, a matter that the court ruled was beyond the reach of Section 501, since that section only "applies to fiduciary responsibility with respect to money and property of the union," it does bespeak a wholesome reticence about substituting a court's notion of fairness for that of the union members or their authorized representatives.

Before turning to the specific charges of impropriety made by plaintiffs, a brief discussion of two threshold issues—to which defendants surprisingly devoted roughly half of the length of their briefs—is required.

## LACHES

■ Actions under Section 501 are equitable in nature rather than legal, *Local No. 92, International Association of Bridge, S. & O. I. Workers v. Norris,* 383 F.2d 735, 741 (5th Cir. 1967), and are governed by the doctrine of laches, rather than any local statute of limitations. *Yablonski v. Mine Workers,* 80 L.R.R.M. 2594 (D.D.C.1971).

Defendants argue that this action alleging improprieties going as far back as 1963, eight years before the demand letter, is barred by laches. However, defendants fail to suggest any respect in which they have been prejudiced by the delay in bringing suit.

Most of the improprieties complained of—excessive compensation and pensions and payment of personal expenses—are continuing offenses. As the Second Circuit stated in *Morrissey v. Curran, supra,* 423 F.2d at 399:

> "[T]he matter of improper payments of union funds to persons not entitled to them is a continuing offense and cannot bar an injunction to prevent continued payments or an accounting for all of the unlawful expenditures."

If plaintiffs were seeking by this action not merely to recover from the recipients of improper payments or other benefits, but to surcharge the officers or trustees responsible therefor, it could be argued with considerable force that those subject to surcharge for improper expenditures that did not directly benefit them would have been seriously injured by the delay, since an earlier adjudication of the propriety of these expenditures would have allowed them to take corrective action and limit their personal liability. This, indeed, was the reason expressed by Judge Danaher for his dissent in *Morrissey v. Curran, supra,* 423 F.2d at 405.

■ However, during the trial of this action plaintiffs, with the approval of the Court, expressly waived any claim of surcharge, thereby limiting the relief sought to recovery from the defendants who received excessive payments or perquisites and an injunction against their continuation in the future. The delay in bringing suit obviously did not injure those who continued throughout the period of delay to receive benefits to which they were not entitled. And there is clearly no reason why those who have misapplied union funds and are

still doing so should be allowed to continue merely because their misdeeds went so long unchallenged.

## HARASSMENT

Defendants also argue, with a fervor approaching vehemence, that plaintiffs have prosecuted this action in a manner which constitutes harassment. Defendants are particularly critical of what they feel are plaintiffs' repeated and unexpected shifts in the grounds of suit, rendering it impossible for defendants to prepare for their defense, and thereby depriving them of due process.

As already remarked, the trial was indeed somewhat unconventional, and plaintiffs' proofs were adduced in a rather disorganized manner, leading the Court to comment at one point

"I have a disquieting feeling that we are not trying this case; we are groping for it."

At another point, the Court observed that plaintiffs appeared to be "combining trial with discovery."

However, not all of the blame can be lodged with plaintiffs. Defendants met plaintiffs' discovery demands with exhausting and exasperating inaction and evasion. Repeatedly, discovery to which plaintiffs were clearly entitled was obtained only after a series of time extensions, broken promises and ultimate Court intercession. There were additional obstacles to discovery that were not of defendant's creation: a great bulk of the Union's files had been surrendered to the United States Attorney for the District of New Jersey for examination in connection with a pending criminal investigation.

Whatever its cause, the frustration of plaintiffs' discovery efforts was a principal factor in the Court's allowing plaintiffs unusual latitude in the presentation of their case.

Moreover, there were no issues tried which did not fall fairly within the broad specifications of misfeasance in plaintiffs' demand letter, the even broader descriptive paragraphs of Judge Carter's order authorizing the action, and even within the more specific paragraphs of this Court's Memorandum and Order of May 19, 1977.

Defendants do not contend otherwise, but instead complain that the very breadth of the demand letter and the authorizing order left them open to all manner of charges, without adequate notice as to what they should prepare to meet. Defendants' protestations of surprise become almost ridiculous when it is recalled that there was a hiatus of *over a year* between the close of plaintiffs' case and the time defendants were required to put in their case, during which interval plaintiffs submitted memoranda in opposition to defendants' motion to dismiss, reciting in detail, with citations to the testimony and exhibits, exactly what plaintiffs believed they had proven.

It would be difficult to imagine trial procedure that could have given the defendants more complete and precise advance notice of the charges against them, or a better opportunity to meet them.

Finally, it is perhaps not inappropriate to note that the very nature of the action justifies some flexibility in the normal trial procedure. Actions under Section 501 have been likened to stockholders' derivative suits. *McNamara v. Johnston, supra,* 522 F.2d at 1162. The interests of the Union members, like those of the stockholders, are championed by a volunteer representative in whose selection they had no voice. Their self-appointed protagonist chooses the trial attorneys, selects and frames the charges against the defendants, and may even become a principal witness at the trial. The plaintiff and his counsel may or may not be well fitted for their roles. If, for this or any other reason, their performance is less than fully competent, important rights of the absent members—the real parties in interest—may be destroyed by *res judicata* or collateral estoppel. This imposes a special responsibility on a Court to assure that the interests of the union members are fully preserved, while maintaining absolute judicial objectivity and safeguarding the equally important rights of the defendants to due process.

To the extent that the Court in this case has relaxed the conventional protocol of trial, it was only for the purpose of ensuring that all relevant and material evidence bearing on the Court's decision would be made available to the Court. Defendants have been unabashed beneficiaries of this liberality; almost up to the date of this opinion, they were continuing to supply to the Court, at its request, proofs of authorization of some of the challenged expenditures. It therefore ill becomes them to protest that access to other relevant evidence should have been foreclosed in obeisance to procedural formalism, particularly where they had ample notice of and opportunity to meet all plaintiffs' proofs.

With these preliminaries out of the way, we may at last turn to plaintiffs' specific allegations of impropriety.

## CURRAN'S COMPENSATION

Curran's base salary was fixed at "$25,000 net" on June 29, 1959, was raised to "$30,000 net" for the years 1962 and 1963 and was raised to "$40,000 net" for 1964. In addition, as the NMU members received increases through collective bargaining, the salaries of the officers were increased by 10% in 1969, 6% in 1971 and 5% in 1972. Thus Curran's authorized salary, at the time of his retirement in 1973, was $48,972 "net."

The Union has construed the term "net" to mean after all taxes, and has paid the Federal, State and City income taxes and Social Security taxes on Curran's salary, giving him the specified amount as take-home pay.

In addition, commencing in 1963, Curran was annually given pay "in lieu of vacation" apparently equal to his salary, plus taxes, for the entire four-week vacation period allowed by the NMU Constitution in each year through 1968 and for four weeks of the sixty days allowed each year thereafter. In addition, in 1963 he was given retroactive pay "in lieu of vacation" for the preceding five years, at a total cost to the Union of $31,000, including taxes, in that one year.

The annual costs to the Union were as follows:

| Year | Pay in lieu of Vacation | Taxes | Total Cost to NMU (including base salary) |
|------|------------------------:|------:|------------------------------------------:|
| 1963 | $ 31,000.00 * | $ 43,495.14 | $ 83,940.00 |
| 1964 | 6,324.16 * | 39,015.62 | 82,092.00 |
| 1965 | 10,825.00 * | 34,483.12 | 77,560.00 |
| 1966 | 7,540.00 * | 35,463.12 | 78,540.00 |
| 1967 | 3,076.88 | 34,988.12 | 78,065.00 |
| 1968 | 4,615.34 | 46,764.66 | 91,380.00 |
| 1969 | 5,039.02 | 50,360.98 | 95,400.00 |
| 1970 | 7,384.41 | 47,265.51 | 94,649.92 |
| 1971 | 7,384.61 | 43,727.64 | 91,112.25 |
| 1972 | 12,934.97 | 38,445.03 | 91,380.00 |
| Total | $ 96,124.39 | $414,008.94 | $864,119.17 |

* including taxes

Plaintiffs argue that the Union's payment of the taxes on Curran's salary was illegal in view of Section 385 of the New York Tax Law, which provides:

"It shall be unlawful for any person to agree or contract directly or indirectly to pay or assume to bear the burden of any tax payable by any taxpayer under the provisions of this article. Any such contract or agreement shall be null and void and shall not be enforced or given effect by any court."

That provision, of course, concerns only New York state taxes and would be wholly irrelevant to the Union's payment of federal and city taxes. *Fridrikson v. Fridrikson,* 35 A.D.2d 939, 316 N.Y.S.2d 469 (1st Dept. 1970).

Moreover, even as to *state* taxes, the statute merely provides that agreements to pay the taxes of another are void and unenforcible. The present suit does not seek to nullify an executory contract to pay Curran's taxes. Instead it is contended that past payment of his taxes constituted a breach of fiduciary duty in violation of Section 501.

This Court cannot conclude that it did. The Court of Appeals for the Third Circuit in *Farnsworth v. Commissioner of Internal Revenue,* 270 F.2d 660, 664 (3d Cir. 1959), was confronted with the somewhat analogous question whether payments of the taxes owed by one's business partners were deductible for tax purposes in view of the New York statute voiding agreements to make such payments. The court reasoned:

"Section 385 is not a criminal, a quasi-criminal, or even a penalty statute. Its sanctions are purely civil, i. e., the denial of enforcement of contracts made contrary to its provisions. [Footnote omitted.]

\* \* \* \* \* \*

"Under Section 385 payment is not a statutory violation. The contract for the payment is merely rendered unenforceable. Here, the compromise agreement was executed fully. This is not a minor distinction in view of the fact that the New York *fisc* was not frustrated for it received the funds for which it contracted by way of the compromise agreement."

In a footnote, the court added:

"The precise motivation of Section 385 is difficult to ascertain. There seems to be no available legislative history. However, it is interesting to note that many States recognize as legal covenants to pay other's income taxes. See e. g., *Young v. Illinois,* 310 Ill. 75, 141 N.E. 369, 30 A.L.R. 985; *Republic Bldg. v. Gaertner,* 201 Ky. 509, 256 S.W. 1111, 30 A.L.R. 982; *Kim-*

*ball v. Cotting,* 229 Mass. 541, 118 N.E. 866, L.R.A. 1918C, 1189. It is possible that the intent of the New York State Legislature in enacting Section 385 was merely to prevent collusive or otherwise illegal agreements in respect to divorce proceedings." *Id.* at 664 n.6.

It seems to this Court at least equally likely that the purpose of the statute was to prevent the loss of revenue that the state would suffer if the taxes were computed on the net income rather than on the gross (including the indirect income that the taxpayer receives by virtue of the payment of his state taxes).

Here there was no frustration of such state purpose because the taxes were computed on the basis of the gross cost to the Union of the direct payments to Curran plus all taxes, federal, state and city.

Plaintiffs challenge the payment of taxes on Curran's salary on the additional ground that the members of the NMU did not realize when they voted to approve a specified amount "net," that this meant that the Union would pay all federal, state and city taxes on Curran's salary; much less did they appreciate the magnitude of the gross cost to the Union of the salary plus taxes.

Curran's salary was changed to a "net" basis in 1959. The proposition for this salary change which was submitted to a union-wide referendum merely read "That the President of the National Maritime Union be paid $25,000 net per year." However, the proposition was discussed in meetings of the NMU members in each official port before the vote. Port Agents or other NMU officials who attended the July 1959 port meetings in New York City, Philadelphia, Charleston, Mobile, Tampa, Joliet, San Francisco and San Pedro testified at the trial. Each stated unequivocally that at the meeting he attended it was explained, in substance if not *in haec verba*, that the term "net" as used in the proposition meant that the Union would pay all of the income taxes due on Curran's salary, leaving him the specified amount as take-home pay.

Several witnesses explained that this concept of net pay was a familiar one to seamen, since at the completion of each voyage, when the crewmen are paid off, each receives a voucher showing his gross pay and each of the deductions, including income tax withheld, as well as the net amount paid to him.

The July 16, 1959 issue of *The NMU Pilot*, which is circulated to all members of the Union, contained an article by Steve Federoff, the NMU Secretary-Treasurer, urging support of the referendum in which it was stated, with reference to Curran:

"He has devoted his life to achieving better living and greater security for seamen and to the building of a free, democratic and strong National Maritime Union. It is only fitting that we should see that he receives $25,000 per year *take-home pay* for as long as he is president of NMU." (Emphasis added.)

There thus appears to be little doubt that even at the time the members initially voted to approve a "net" salary for Curran, they were generally aware that the amount specified would be his take-home pay, and that in addition thereto the Union would be paying very substantial taxes thereon.

Moreover, in later years, information regarding the total cost to the Union was widely disseminated. For example, plaintiff Morrissey testified that about 1963 he had read an article in U.S. News & World Report listing the highest paid labor leaders in the country and noted that Curran topped the list with "$105,000 that year, I think." (1963 was the year in which Curran was given retroactive pay in lieu of vacation for a number of past years.) Morrissey further testified that as early as 1966, in his releases to NMU members, he had pointed out that Curran's "net" salary of $40,000 was costing the Union "$85,000 a year or $95,000."

Plaintiffs, both in their cross-examination of the witnesses and in their briefs, have stressed that no one other than the Union officials directly involved in the actual payments knew exactly the gross cost to the Union for Curran's salary and taxes. But this is scarcely surprising. Nor is it persuasive that the members voted to approve Curran's salary without realizing that the cost to the Union would substantially exceed the "net" salary specified. Given the esteem in which Curran was generally held by the members, it appears likely that they would have approved the salary even if they had known in advance its exact cost to the Union.

█ The Court concludes that the Union's payment of all the taxes due on Curran's "net" salary was not a violation of Section 501.

### 1. *Severance pay*

At the time of his retirement in 1973, Curran was given gross severance pay amounting to $363,296.46, which was calculated to leave him $142,835 net after taxes.

The NMU membership had approved a provision proposed by the National Council authorizing severance pay for officers with more than 25 years of continuous service, as Curran had, of one month's pay for each year of service. This entitled Curran to severance pay equal to 35 months' salary.

█ As previously mentioned, Curran's authorized rate of pay was $48,972 per year or $4,081 per month. Multiplying the latter figure by 35 yields a product of $142,835, which was the authorized net severance pay after taxes. The record does not reflect whether the taxes payable on Curran's severance pay were actually equal to the difference of $220,461.46 which was allowed him for that purpose. The Court will order an accounting in which his taxes for 1973 shall be computed, and he must make full restitution, plus interest, of any excess of that allowance over the taxes actually payable on his severance pay.

### 2. *Tax refunds*

Curran received still another form of compensation which the Union members, and probably even the members of the National Council, did not know about, much less authorize. These were the annual federal, state and city income tax refunds

which Curran received and retained in the following amounts:

| Year | Total Tax Refunds |
|------|-------------------|
| 1963 | $ 1,981.09 |
| 1964 | 873.14 |
| 1965 | 411.36 |
| 1966 | 599.01 |
| 1967 | 1,615.39 |
| 1968 | 451.03 |
| 1969 | 3,203.14 |
| 1970 | 923.25 |
| 1971 | 1,530.96 |
| 1972 | 279.00 |
| | $ 11,867.37 |

Obviously these refunds, representing overpayments by the NMU of the taxes on Curran's salary, should have been returned to the Union rather than being pocketed by Curran.

Moreover, the refunds would have been even greater except for the fact that in each year Curran had outside income on which taxes were payable. He reported interest income as follows:

| Year | Interest |
|------|----------|
| 1963 | $ 1,005.07 |
| 1964 | 1,399.86 |
| 1965 | 660.72 |
| 1966 | 1,886.20 |
| 1967 | 1,512.15 |
| 1968 | 1,737.66 |
| 1969 | 1,481.82 |
| 1970 | 1,040.00 |
| 1971 | 1,499.00 |
| 1972 | 2,031.00 |
| | $ 14,253.48 |

He also reported an excess of reimbursements over expenditures in connection with AFL–CIO meetings as follows:

| Year | Excess |
|------|--------|
| 1963 | $ 13.00 |
| 1964 | 391.80 |
| 1965 | 488.07 |
| 1966 | 291.95 |
| 1967 | 395.00 |
| 1968 | 504.10 |
| 1969 | 720.98 |
| 1970 | 703.00 |
| 1971 | 558.00 |
| 1972 | 686.00 |
| | $4,751.70 |

Since Curran received refunds every year, it is obvious that the estimated tax payments which the Union made for Curran each year were more than sufficient to cover the actual taxes on not only his NMU salary but his outside income as well. Had it not been for Curran's outside income, the refunds, to which the Union was entitled, would have been even greater. Thus, the Union has, in effect, paid the taxes on the outside income. This was clearly not within the authorization to pay the taxes on Curran's NMU salary. Curran must therefore reimburse the Union, with interest, for the difference between the net taxes actually paid on his reported income (including the outside income) and what the taxes would have been without the outside income. The exact amounts to be repaid will be determined by an accounting.

## PAY IN LIEU OF VACATION

In addition to the aforementioned payments to Curran "in lieu of vacation," the other defendant officers received such payments for the years 1963 through 1972 in the following total amounts:

| | |
|------|-----------|
| Wall | $ 17,309.52 |
| Barisic | 2,600.00 |
| Miller | 6,280.00 |
| Martin | 880.00 |
| Bocker | 6,764.00 |
| Strassman | 9,120.00 |
| Nesbitt | 15,830.00 |

Through 1968 the NMU Constitution, Article 14, § 3 provided:

"All officers having one (1) or more years of continuous service shall receive four (4) weeks of vacation with pay at such time or times as may be determined by the National Office."

In 1969, this Section was amended to provide "sixty (60) days of vacation with pay." The provision has remained unchanged since that time.

The giving of pay "in lieu of vacation" is not mentioned in the Constitution or by-laws, and defendants do not contend that

the practice was ever expressly approved by the NMU membership. Instead, they merely argue that such payments are customary and reasonable where employees are required to give up part or all of their vacation time to work on the business of the employer.

If Union officers actually were required to sacrifice their vacation to attend to Union business that was so urgent that it could not await their return, and which was of such nature that it could not be adequately handled by others, it would not appear unreasonable to compensate them, at their regular rates of pay, for the time so spent. Such expenditures would at least arguably fall within the general provision of Article 8, § 13, that:

> "The National Office is empowered to authorize the expenditures of such funds as it may deem necessary for the proper administration of the Union's affairs, consistent with the stated purposes and objects of this Constitution."

And such expenditures would at least arguably be free of the requirement of Article 14, § 1(a) of the NMU Constitution that the "salaries" of officers are subject to approval by the membership, since they would not represent changes in the base salary, but overtime compensation, at the same rate, for work done during the vacation periods to which the officers were entitled under the Constitution.

But, in the case of Curran, at least, the evidence is overwhelming that the pay "in lieu of vacation" was given not as compensation for vacation time actually sacrificed to work on urgent Union business, but automatically, as an unauthorized increase in salary.

No contemporaneous records of Curran's vacation time were kept. Apparently no one dared request substantiation of his perennial claim that he never had a vacation, although it was common knowledge that, particularly in the latter years of his presidency, he spent only a small fraction of the time in his New York office. Curran acquired a home in Boca Raton, Florida in 1964, and spent considerable time there each year until 1972, when he transferred his legal residence there. Perry estimated that Curran was in Florida 70% of the time during that period "not doing a damn thing." Curran owned a series of power boats on which he cruised not only off Florida but also the Bahamas, Block Island and Nantucket. He insists that he was always available for calls on Union business and was frequently consulted. His claim of frequent consultation, at least, appears to be valid. Perry himself said that he sometimes spoke to Curran by telephone as many as 5 or 10 times a day.

But it is clear that, at the very least, Curran took his full allotted vacation period every year. Indeed, on cross-examination he admitted that, in addition to his lengthy stays in Florida and afloat, he took a two-week vacation trip to Mexico in 1968 and took five weeks off in 1970, two weeks of which were spent on a trip to Europe to visit his son in Heidelberg. Nevertheless, each year he received extra pay for at least four weeks every year, and even more in 1970, admittedly "on the assumption that [he] never had a vacation." The irrebuttable weight accorded this assumption is betrayed by the fact that his pay "in lieu of vacation" for each calendar year was given on the first payday of that year.

The impropriety in the case of Perry was even more blatant. When Perry was discharged in January 1969, he was paid in full to the end of his contract, which ran to October 20, 1974. In the Court's Memorandum of May 19, 1977, it was concluded that the contract was enforcible, and that no violation of Section 501 was involved in paying Perry his salary for the full unexpired term of the contract. However, there was no conceivable justification for giving Perry an extra month's pay "in lieu of vacation" for each remaining year of the contract.

Of the $176,602.61 which Perry received at the time of his discharge, $9,294.82 represented pay "in lieu of vacation for the 4½ years remaining on his contract. Perry's discharge in effect gave him a 4½-year paid vacation, all of which he took. Having

taken it, and having done no work for the Union during that period, he is clearly not entitled to any pay in lieu of vacation.

With respect to the other defendants, however, the record is not so clear. Breit, the NMU comptroller, testified that records of their vacation periods were kept and that they were given pay "in lieu of vacation" for only the vacation time which they actually sacrificed. To confirm this, their "vacation cards" were introduced in evidence. And the defendants Wall, Barisic, Miller, Martin and Bocker all testified that they never received extra pay for any vacation time they actually took.

There is considerable reason to view these generalizations with skepticism, just as there was undoubtedly exaggeration in the claims of several of the defendants that they "never" or "seldom" took vacations, or that, when they did, they were often called back on urgent Union business. Indeed, several of the officers received pay "in lieu of vacation" in a pattern so nearly uniform as to create a strong inference of automatic treatment.

Wall received a full month's extra pay every year except 1964 and 1970. This means that in the years 1963 and 1965, when he was entitled to only four weeks' vacation, he claimed to have had no vacation *at all*.

The same is true of Nesbitt, who received at least a full month's extra pay every year except 1964. Nesbitt made up for this one omission by taking more than a month's extra pay in 1963 and 1969. Since he was entitled to only four weeks' vacation in 1963, he must have been given that year retroactive pay in lieu of vacation for previous years, as Curran was.

Miller similarly received in 1963 pay in lieu of vacation amounting to $3,000, which was greater than his salary for the full four weeks' vacation period.

Miller testified that after the Constitution was amended in 1966 to allow 60 days of vacation, it was customary for the officers to take only 30 days and to draw pay in lieu of vacation for the balance. Strassman at least was paid in accordance with this pattern; he received no pay in lieu of vacation prior to 1966 and one month's salary each year thereafter. Martin similarly received a total of only $1,360 pay in lieu of vacation for the five years 1963 through 1967, but received a month's extra pay each year from 1968 through 1970.

There was no convincing evidence that the claimed sacrifice by these officers of one-half of the 60 days of vacation they were allowed after 1966 was required for the handling of urgent Union business that could not be handled by others. It apparently was simply a voluntary practice routinely followed by most of the officers as a means of effectively increasing their annual salaries.

Nor is there any evidence that the Union members anticipated when they voted to approve an increase of the vacation period from four weeks to 60 days, that most of the officers would regularly continue to take only 4 weeks' vacation and draw an extra month's pay in lieu of vacation every year. If this practice had indeed been contemplated, the proposition should have been stated in terms of an increase in salary for the officers.

The practice of giving pay in lieu of vacation was discontinued after 1972. It seems no mere coincidence that the discontinuance followed shortly after plaintiffs' letter to the Union officers demanding the filing of an action for recovery of excessive compensation, with specific reference to unauthorized pay in lieu of vacation.

Notwithstanding all these considerations, the Court cannot conclude with any degree of assurance that any of the defendants, other than Curran and Perry, received pay "in lieu of vacation" for vacation time which he actually took.

Assuming that an officer actually sacrificed some or all of his vacation time, whether or not it was necessary for him to do so, the officer would have given up something of value, and it would be unfair to delay for years any challenge of the practice, while allowing the sacrifice to continue.

■ The Court thus concludes, as to the payments "in lieu of vacation" to all the officers other than Curran and Perry, that no violation of Section 501 has been established.

## PERSONAL EXPENSES

### a. *Automobiles*

The NMU maintains at the Union headquarters in New York City a small fleet of automobiles for general use. This fleet currently includes a Cadillac limousine, a Dodge van and a Ford station wagon. In 1968 and 1970 it included a number of Volkswagen vans.

In addition, for a number of years prior to February 1, 1971, the Union furnished individual automobiles (originally Lincoln Continentals and later Cadillacs) to the defendants Curran, Wall, Barisic, Miller, Strassman, Nesbitt and Perry, as well as to Hoyt Haddock, the Washington, D. C. lobbyist for the maritime industry. Some of these automobiles were purchased outright by the NMU and others were obtained on long-term leases. Some of the money thus expended came from the NMU general fund and some, unaccountably, from the NMU Fighting Fund, which is financed by purportedly voluntary contributions of Union members, and is intended for educational and political purposes, such as contributions to political campaigns, lobbying and the like.

Each of those who were furnished an automobile by the NMU was also provided with oil company credit cards on which he charged the gasoline and oil and presumably the other expenses of operating and maintaining the vehicle.

Although furnishing an automobile to a Union officer for his personal use was at least arguably within the scope of the "demand" letter and of Judge Carter's order authorizing suit, in answer to interrogatories requesting a specification of the types of expenditures which plaintiffs would charge to have been improper, plaintiffs did not list the cost of the personal automobiles furnished to the individual defendants. Ac-

cordingly, at a conference before the trial, the Court ordered that this item would be excluded from the case. Plaintiffs shortly thereafter brought a separate action against the defendants in which they asserted this claim, together with a claim for misuse of moneys in the seamen's pension fund. That action, 76 Civil 738, was assigned to and is still pending before Judge Robert J. Ward of this Court.

Accordingly, the claim that the provision of personal automobiles constitutes a misuse of Union funds will not be considered herein.

### b. *Expense accounts*

Each officer of the NMU was given an apparently unlimited expense account. In addition to being furnished by the NMU with credit cards of all of the leading credit card companies, each officer was authorized to incur charges against the Union at leading hotels and airlines. The total disbursements of the NMU for such charge accounts during the six-year period from 1967 through 1972 were as follows:

| | |
|---|---|
| United Airlines | $445,318.04 |
| American Express | 161,553.40 |
| Hotels | 133,996.36 |
| Carte Blanche | 42,943.60 |
| Avis | 26,775.53 |
| Diners' Club | 23,521.38 |
| Hertz | 7,425.16 |
| Total | $841,533.47 |

In addition to these charge privileges, the officers were reimbursed for their out-of-pocket expenditures for Union purposes. Each officer approved his own expense account. The reimbursed out-of-pocket expenses for each officer (not including the credit card charges) averaged over $3,000 per officer for the fiscal year ending June 30, 1969 (the last year such expenses were separately reported). Including the credit card charges, the reimbursed expenses averaged over $5,000 per year per officer.

The only evidence that any of these expenditures were not for legitimate Union purposes was the testimony of Perry to the effect that whenever he travelled with Union officers he picked up all the checks and

the officers nevertheless put in vouchers for the same expenses.

 Not surprisingly, this charge was denied by each of the officers who testified about the matter, and by Milton Breit, the NMU Comptroller. In view of the conflict in the testimony and the lack of any records establishing the existence, much less the extent, of misuse of Union funds to reimburse personal expenses of the defendant officers, the Court is regrettably forced to conclude that this charge has not been proven.

c. *Weekly "allowances"*

In addition to apparently unlimited credit-card privileges and reimbursement for all out-of-pocket expenditures, after February 1, 1971, when the Union ceased furnishing an automobile to each national officer for his personal use, each officer was given an "allowance" of $100 per week, for which he was not required to account. Defendants contend that the automobiles which had theretofore been furnished to the officers individually, together with the gasoline and other operating expenses, cost the Union at least $100 per week for each automobile. However, no membership approval of the expenditure for the personal automobiles, much less the allowances, has been brought to the attention of the Court in response to its specific request therefor.

Since automobiles have been and are available at NMU headquarters for use on Union business, and since all of the officers' business expenses, for airline tickets, rental cars, hotels, meals and everything else have been and are either charged to or reimbursed by the Union, these no-questions-asked "allowances" are clearly redundant. They amount to nothing more than a device for giving the officers an unauthorized increase in pay.

 Each defendant officer shall be required to reimburse the NMU general fund in full for the total amount of the allowances which he received, as determined by the accounting.

While it is conceivable that some of the cash "allowances" was actually used by the recipient for legitimate Union expenses, it appears certain that the amounts so used were far exceeded by the personal expenses of the recipient which were charged to or reimbursed by the Union. To order the defendant officers to make restitution only to the extent of the "allowances" is thus to give them the benefit of the doubt. This accords with the approach approved by the Court of Appeals in *United States v. Ferrara*, 451 F.2d 91, 98 (2d Cir.), cert. denied, 405 U.S. 1032, 92 S.Ct. 1291, 31 L.Ed.2d 489 (1971):

"Ordering repayment of portions of the unauthorized personal expenditures ($17,000 by appellant Ferrara and $5,000 by appellant Russell) was proper. *United States v. Berger*, 145 F.2d 888 (2d Cir. 1944), cert. denied, 324 U.S. 848, 65 S.Ct. 685, 89 L.Ed. 1408 (1945); cf. *United States v. Caiello*, 420 F.2d 471, 476 (2d Cir. 1969), cert. denied, 397 U.S. 1039, 90 S.Ct. 1358, 25 L.Ed.2d 650 (1970). By limiting the amounts to be repaid to sums substantially lower than the total expenditures made, the trial judge here avoided the problem of determining independently the 'exact amount' to be reimbursed to the Union, *United States v. Stoehr*, 196 F.2d 276, 284 (3rd Cir.), cert. denied, 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643 (1952), a problem which might otherwise require a remand. *See Karrell v. United States*, 181 F.2d 981 (9th Cir.), cert. denied, 340 U.S. 891, 71 S.Ct. 206, 95 L.Ed. 646 (1950)."

d. *Miscellaneous personal expenses*

Perry testified that the NMU paid all of Curran's personal expenses, for everything from his "booze to his bobby pins." The NMU Comptroller, Milton Breit, explained that he handled all Curran's finances, paying all his bills, either by cash or check, preparing his tax returns, and even supplying him with pocket money. However, Breit insisted that all of the checks were drawn on Curran's bank account and all of the cash disbursements came from a petty cash fund which Breit kept for Curran and

which was established and replenished by deducting $500 a month from Curran's pay check before depositing the balance in his bank account.

Perry also testified that all of Curran's suits were custom made for him by a tailor named Jesse Israel and paid for by the NMU. He said that Israel came to the NMU headquarters on a number of occasions to measure Curran for suits. Curran denied ever getting a suit from Israel and further denied that the NMU had ever paid for one of his suits except once when his only suit was torn and a collection was taken up to buy a replacement. However, Curran's flat denial strains credulity in view of Breit's testimony that at least "once or twice" he saw Israel in the NMU office fitting Curran for a suit. But Breit denied ever having paid for a suit for Curran.

Perry further testified that he and a number of other NMU employees spent many weekends working at Curran's farm in Dutchess County, New York, doing construction and maintenance work as well as routine farm chores. One of the employees called by plaintiffs to testify on this matter denied he had ever been to Curran's farm and another admitted being there some ten times in 1966 and 1967 and painting the house at least partially inside and outside, but he insisted that Curran had personally paid him for his work. Still another employee said he had been there three times and had done some work on the barn, without stating whether he was paid.

Perry also said that Curran received substantial gifts from various persons or organizations doing business with the NMU. He claimed that the contractors who were constructing several buildings for the NMU in New York City did considerable "free" work at Curran's farm, completely rebuilding the interior and installing a new kitchen. Perry asserted that the NMU paid for the materials, as it also did for work on the house of defendants Mel Barisic, Shannon Wall and other Union officials. Perry also claimed that the furniture for Curran's Boca Raton home was paid for by Abe Freedman, the NMU legal counsel, who was on a $50,000-a-year retainer. Curran denied this, stating that all of the furniture in the Boca Raton house was brought down from his farm in Dutchess County, and that the only new furnishings bought for the Boca Raton house was a rug which he paid for himself.

Perry further charged that meat for all the national officers, paid for either with NMU funds or by steamship companies, was delivered to the Union offices once a week by Kansas Meat Packing Co.; defendant Mel Barisic took the officers' advance meat orders and the officers picked up their meat every Friday afternoon and took it home. Perry added that one Friday after he had been fired, he picked up all the meat that was there and took it to his own home. Several of the NMU officers who testified denied receiving any free meat, except an occasional Christmas turkey. Two NMU checks to Kansas Meat Packing Co. were introduced in evidence, but there was testimony that one of these checks was for Christmas turkeys distributed in underprivileged neighborhoods and the other was for feeding the crew of a vessel stranded at a Brooklyn pier.

In cross-examining Perry, defendants attempted to portray him as disgruntled and vindictive, because of his discharge from the NMU. However, Perry was paid in full for the four and one-half years remaining on his employment contract—a total of $176,602.61—and in addition, although he was not an officer of the Union, was given a lump-sum pension payment of $222,000 from the OPP. Plaintiffs obtained a judgment against Perry in this Court for the amount of the pension, but the judgment was never collected from Perry; instead, it was surcharged against Abraham Freedman, one of the three OPP trustees responsible for the improper payment, the other two trustees having been immunized from liability by an exculpatory provision in the Trust Agreement. *Morrissey v. Curran, supra,* 483 F.2d at 483. Thus, while Perry's discharge may have wounded his pride, it was a bonanza for his exchecquer.

The evidence, considered as a whole, creates a powerful impression that the flagrant misuse of NMU funds for the payment of personal expenses of the officers was standard operating procedure, and that the acceptance of substantial personal favors as a form of kickback from suppliers was far from a rarity.

However, the specific details of such transactions—dates, amounts, etc.—cannot be gleaned from the present record. Perry's accusations, made wholly from memory, were understandably lacking such particulars. Nor would an accounting be likely to uncover records of the misapplication of funds; the expense accounts surely all appear legitimate on their face. Thus the ordering of an accounting would doubtless be merely an exercise in futility.

 The Court is again left with no alternative but to conclude, reluctantly, that plaintiffs have failed to prove this aspect of their case.

### e. *Travel expenses*

 Curran testified that on two different occasions within a four-year period he and a number of other NMU officers and the trustees of the NMU Seamen's Pension Plan or "Deep Sea" Fund, and all of their wives took the grand tour to Spain, Portugal, England, Denmark and Italy, with all of the expenses being paid for out of the Deep Sea Fund. Curran claimed that the object of these junkets was to visit retired members living in Europe and "find out how our pensioners were making out." The Court cannot believe it was really necessary to take so many officials *and their wives* to check on the status of a few retirees living in Europe. It therefore concludes that the only significant purpose was the personal enjoyment of the participants.

Although the trustees of the Deep Sea Fund are not parties to this action, the defendant officers who participated in these trips should make full restitution to the Deep Sea Fund for their share of the cost thereof, to be determined by the accounting.

Many other personal vacation trips were taken by the defendant officers at the expense of the NMU general fund. Milton Breit, for example, made trips to London, Rome and Israel at Union expense. He claimed that the trips were on Union business, but his explanation of the nature of that business was unconvincing, particularly in view of Curran's testimony that he had not instructed Breit to make such trips and did not even know that he had gone. These trips appear to have been substantially personal in nature with any Union purpose being inconsequential. However, since Breit is not a party to this action, and since any claim for surcharge has been waived, restitution by Breit will have to await a separate action.

The cost of Curran's numerous trips between his home in Florida and NMU headquarters in New York was paid out of the NMU general fund. Curran's decision to move from New York to Florida was based purely on personal considerations. There is no reason why the Union should pay the additional transportation cost which that choice entailed. Curran will be required to make full restitution for the cost of these trips, to be determined by the accounting.

### f. *Legal services*

Plaintiffs also seek reimbursement from Curran for $7,527.97, the amount disbursed by the NMU in payment of two bills to Curran from the law firm of Paul, Weiss, Rifkind, Wharton and Garrison for legal services rendered during the period from March 6 to December 10, 1973 in connection with two lawsuits against Curran and other NMU officers. One action is identified only as *"Morrissey v. Curran"* and is presumably the present action. The other action is identified only as *"Wimbush v. Curran"*. It is presumably the same case in which a decision is reported at 356 F.Supp. 316 (S.D. N.Y.1973), in which Judge Carter granted Wimbush, a former NMU patrolman, and other Union members, leave to sue Curran and other officers under Section 501 of LMRDA for recovery of amounts paid by the NMU for allegedly personal expenses

and for "unused" vacation time which was allegedly taken.

The *Wimbush* action was settled in 1973 for the modest sum of $10,792.18, which was paid to Wimbush by the NMU. The record contains no explanation of the reason for the settlement or the basis of computation of this settlement figure. However, the pendency of this action might have furnished a reason for Wimbush to discontinue his action. In that connection, it is interesting to note that one of the last services described in one of the attorneys' bills was "consideration of relationship of *Wimbush* to *Morrissey v. Curran.*"

It is also unclear from the record whether Paul, Weiss represented only Curran in these actions, or the other officers as well. But it appears significant that the bill was mailed to Curran at his home in Boca Raton, despite the fact that he had retired from the presidency of the NMU on March 1, 1973, shortly before the first of the services were rendered.

Since in both this case and the *Wimbush* case, the defendants were accused, with ample justification, of having misapplied Union funds to their personal profit, the use of Union funds for the payment of legal services rendered in the defense of these charges is "inconsistent with the aims and purposes of the Labor Management Reporting and Disclosure Act, supra, and beyond the powers of the [Union]." *Highway Truck Drivers and Helpers, Local 107 v. Cohen,* 334 F.2d 378, 381 (3d Cir.) *cert. denied,* 379 U.S. 921, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964). See also *Morrissey v. Segal,* 526 F.2d 121, 127 (2d Cir. 1975), in which the court, in discussing the cases relied on there by the pension trustees to justify reimbursement of the costs of their defense of actions under Section 501, stated

"[I]n no case was it suggested that indemnification would be required or even proper after an adjudication that trustees had breached their duty to the union."

■ This Court concludes that the Union should not have paid for legal services rendered in the defense of this and the *Wimbush* action, and that Curran, who is at least the principal beneficiary of the misappropriations proven herein, if not the sole client represented by Paul, Weiss, should make full restitution therefor.

## OFFICERS' PENSIONS

Article 14, Sec. 7 of the NMU Constitution provides that

"All officers shall be eligible for benefits under the NMU Officers' Pension Plan, subject to such rules and regulations as the Trustees of that Plan may establish."

As of December 29, 1952, the NMU entered into an Agreement and Declaration of Trust with the three then trustees, defendant Martin E. Segal, who was then legal counsel for the NMU, defendant Leon Karchmer, of the accounting firm of Kipnis & Karchmer, who were auditors for the NMU, and Herman E. Cooper. By this Agreement and Declaration, the NMU agreed to establish the OPP with an initial payment of $80,000 and with subsequent quarterly payments equal to 23% of the compensation paid to the officers by the NMU. The Agreement also provided:

"The Trustees shall, as soon as practicable after the execution of this Agreement and Declaration of Trust, meet and adopt a Pension Plan for the purpose of paying retirement benefits to the officers of the Union. The trustees shall have sole and full discretion to determine the amount of such benefits and the terms and conditions of payment and shall have the power to conclusively determine all questions concerning the payment of benefits to any individual recipient or proposed recipient."

As of February 16, 1953, the Board of Trustees established the first OPP; it was amended several times thereafter. Originally the Plan provided, for an officer with at least 20 years of service, a pension of 50% of the officer's "average" salary, with proportionately reduced pensions for officers with less than 20 years' service. In computing the officer's "average" salary, his salary for all years prior to 1963 was assumed to be no less than his salary in 1963. By 1972,

when Curran retired, the Plan had been made much more generous, providing for a pension of 2½% of the "average" salary for each year of service up to a maximum of 40 years (at which point the pension would reach 100% of the "average" salary).

The "regular" pension is paid for the life of the retired officer, plus the retiring officer's choice of either of two alternative options for benefits to his survivors.

(1) payment at the same rate to a designated beneficiary following the pensioner's death for such additional period as will bring the total number of monthly payments up to 120 (10 years of payments); or

(2) payment at one-half the regular rate to the pensioner's widow for her full remaining life, unless she was more than 10 years younger than the pensioner, in which event the payments would be reduced in proportion to her life expectancy beyond 10 years, with payments to a designated contingent beneficiary for such additional period as is necessary to bring the total payment period up to 10 years.

In addition, with the consent of the Board of Trustees of the OPP, a retiring officer could elect to receive at the time of his retirement a lump-sum payment of "equivalent" value. The "equivalent" value is the present value of the anticipated regular pension payments over the average life expectancy of a man his age at the time. The interest rate used in discounting the projected future payments to present value was initially set by the Trustees at 3% and remained at that level at least until 1976.

In 1962, in view of the upward trend in officers' salaries, the payments from the NMU general fund to the pension fund were raised to 26% of the salaries.

In *Morrissey v. Curran*, 302 F.Supp. 32 (S.D.N.Y.,1969), *aff'd*, 423 F.2d 393 (2d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 52, 27 L.Ed.2d 56 (1970), it was ruled that the OPP covered only officers of the NMU and that the payments which had been made to non-officers, including William Perry, were unauthorized. Thereafter, effective January 1, 1972, a new pension plan, called the NMU Employees Pension Plan or Staff Pension Plan ("SPP"), was set up, covering all full-time officers and employees other than those covered by a collective bargaining agreement.

The administration of the SPP was placed under the direction of a Pension Committee, consisting of all of the national officers. This Committee was empowered to compute and certify to the Trustee bank the amount and kind of benefits to be paid to each retiree or terminated employee.

The benefits provided by the SPP were generally the same as those provided by the OPP, except for three significant changes:

1. The "average" compensation was redefined as "the compensation received * * in the highest 60 complete calendar months of the last 120 complete calendar months prior to retirement or other termination * * * divided by 60."

2. In addition to the lump-sum payment option, three accelerated-payment options were provided, likewise at the discretion of the Pension Committee: equal payments over periods of 36, 60 or 120 months, the total payments in each instance equalling the discounted value of the anticipated future payments over the life expectancy of the pensioner at the time of retirement or other termination.

3. The participant was not required at the time of retirement to elect one of the options for benefits to his widow following his death. Instead, the plan provided that the spouse of the participant would automatically receive the optional benefits having the greatest actuarial value.

In March 1979, in order to comply with the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the SPP was amended by adding a new section 4.20 providing that lump-sum and accelerated-payment retirement benefits "will be computed on the basis of the 1971 Group Annuity Mortality Table and a 6½% interest assumption." The amendment recited that it was "effective as of December 1, 1976," but it is unclear whether or how this was intended to affect those

who had already received payments under a lump-sum or accelerated-payment option.

Article 4, § 1 of the NMU Constitution requires that all decisions of the National Office "which change the established policies, programs and procedures of the Union must first be approved by the membership before they are made effective." Treating this provision as applying to changes in pension plans, the National Office submitted the OPP for membership approval at port meetings on November 25, 1974. In *Dinko v. Wall,* 421 F.Supp. 207 (S.D.N.Y. 1976), *aff'd mem.,* 559 F.2d 1202 (2d Cir. 1977), Judge Werker found no "good cause" to believe that the vote taken at these meetings was "invalid and unconstitutional." However, I note that prior to the vote the Union members were not furnished copies of the plan but were merely permitted to read one of several copies which were available at each port and to ask questions about the plan. Considering the complexity of the plan—a 22-page legal document—it appears highly unlikely that many members really knew the magnitude of the pensions which the plan would provide.

Defendants have argued that Judge Werker's decision is *res judicata* as to the claims in this case respecting the pension plan. However, Judge Werker did not rule on the reasonableness of the OPP, but only the regularity of the voting procedure. As previously mentioned, Judge Pollack ruled in *Puma v. Brandenburg, supra,* that even though the pension levels set there by the Union officers had been ratified by the membership, when they are challenged under Section 501, a court must review them to determine whether they are "so overgenerous or otherwise improper as to amount to a violation of trust." Where, as here, the pension plan is presented in such manner as to create doubt that the members adequately understood it, the Court's mandate to verify the reasonableness of the pension scheme is, if course, especially clear.

Unfortunately, the Court is left without any evidence in the record concerning the levels of pensions paid to retired officers of other labor organizations or corporations.

The Court is thus forced to consider the reasonableness of the NMU officers' pensions in the abstract, with no definite benchmark against which to measure them.

Viewed as of the time the pension levels of the OPP were set, they seem generous, to say the least, particularly in conjunction with the very large lump-sum "severance" pay which each officer receives at the time of his retirement. However, perennial monetary inflation has brought the OPP pension levels down into a much more reasonable range. For example, if the OPP had continued in effect, an officer who retired this year after 30 years of service would receive a "regular" pension equal to 75% of his "average" salary over that period (with his salary as of January 1, 1963 treated as his salary for all periods prior to that date). Assuming an annual inflation rate of only 6% since 1963, and assuming further that the officer's pay kept pace with the cost of living over that period (which is roughly the rate at which the average officer's salary has increased during that time), an officer who retired in 1979 after 30 years' service would receive a pension equal to 40% of his salary the final year. If he lived for 13 years after his retirement, by the thirteenth year, continuing inflation at a compounded annual rate of only 6% would effectively cut his pension in half, to only 20% of his salary, in constant dollars, at the time of his retirement.

The pensions are, of course, supplemented by the severance pay as well as by Social Security ; in addition, any officers who were seagoing members of the NMU are entitled to pensions from the Deep Sea Fund, currently amounting to $275 per month. However, an officer who put in sufficient time at sea to earn a seaman's pension would have less time as a Union officer and would accordingly receive a proportionately reduced pension from the SPP.

In view of all the foregoing factors, the Court probably could not have concluded that the "regular" pension payments under the OPP were so excessive as to constitute a breach of trust.

Under the SPP, however, because of the change in the manner of computing "average" compensation, the effect of past inflation in moderating the pensions has been greatly reduced. An officer who retires now after 30 years of service with annual salary increases averaging 6% per annum could retire on a "normal" pension equal to approximately 67% of his final year's salary, in addition to receiving lump-sum severance pay equalling two and one-half times his last annual salary. Investing the latter amount in high-grade corporate bonds at yields currently prevailing would give him additional retirement income equalling approximately 25% of his last annual salary, bringing his total retirement income up to about 92% of his top salary, while still leaving the principal of the severance pay intact as an inheritance for his successors. If he were not interested in leaving an estate, which he well might not be in view of the survivor benefits provided by the plan, he could instead invest the severance pay in an annuity and retire on an income slightly higher than his top salary while working!

If the officer instead retired after 40 years of service, his pension and severance pay would be one-third greater. He could retire on a pension equal to more than 89% of his final year's salary, in addition to lump-sum severance pay equal to three and one-third times his last year's salary. The latter sum, invested in high-grade bonds at current yields, would bring his retirement income up to about 22% above his top salary; invested instead in an annuity, it would bring his retirement income up to about 28% more than his top salary!

By electing a lump-sum or accelerated payment option, the retiree could enjoy still higher retirement income, because the present value of the anticipated future payments is computed on the basis of assumed interest rates—until 1976 only 3% per annum and currently 6½%—which are grossly incommensurate with the yields now prevailing in the money markets. Although these options require the approval of either the Trustees of the OPP or the Trust Committee of the SPP, there is no evidence that such consent has ever been refused.

At the actual interest yields now obtainable, a retiring officer can elect a lump-sum pension payment and invest it in high-grade corporate bonds to receive almost as much income as he would receive from the normal pension payments, while leaving the principal intact as a inheritance for his widow or beneficiaries.

For example, an officer who now retires at the age of 65 with 40 years of service, having reached a salary level of $50,000 per year after pay increases averaging 6% per annum, would be entitled to a normal pension of approximately $44,700 per year. Under the 1971 mortality tables he has a life expectancy of 13 years at the time of retirement. He could elect, with the apparently automatic approval of the Trust Committee, a lump-sum payment in lieu of pension of roughly $385,000 using an interest rate of 6½% in computing present value. If he invested this sum in Aa-grade corporate bonds at currently prevailing yields, he would receive almost $40,000 per year without invading his principal. If he also bought bonds with his severance pay of $166,667, he could have an income of some $55,000 per year without touching the principal. If he instead invested the entire $551,667 in an annuity, he could retire at an income of approximately $65,000 a year— 30% greater than his highest salary as an NMU officer!

■ Even without evidence as to pensions paid by other employers, this Court is convinced beyond any reasonable doubt that a pension plan which, taken in conjunction with the severance pay to which all retiring officers are entitled, gives them a higher income in retirement than they ever had while working, is so excessive that the Union members would not knowingly and voluntarily have approved it. The Court thus concludes the promulgation of the SPP constitutes a breach of trust by the defendant officers and a violation of Section 501.

During the trial, defendants' attorneys stated, without specific supporting citations, that because of ERISA, the Court had no power to diminish the pensions provided

under the SPP. However, none of the briefs have even mentioned this matter. The Court finds no indication in the Act itself, or in the relatively few cases interpreting it, that a court which finds a pension scheme for union officers to constitute a violation by the union officers of their fiduciary duties under Section 501, is rendered powerless, by ERISA, to undo the wrong. It would be a strange result indeed if union officers could set up for themselves a pension plan so extravagant as to amount to phased embezzlement, get it approved by the membership through artful obfuscation and invoke ERISA as an impenetrable shield around their loot. The Court concludes that ERISA does not protect pension plans established in violation of law.

The defendant officers will be directed to propose a new staff pension plan to be submitted first for approval by the Court and then for ratification by the membership after specific disclosure of the retirement income which each of the present officers will receive. Pending such approval, normal pension payments may continue at the levels provided by the SPP, subject to recoupment by reduction of future payments. There will be no further payments under any lump-sum or accelerated payment options until so ordered by the Court; no waiver of rights to elect such options will accrue during the period of such suspension and for thirty days thereafter.

### a. Curran's pension

Curran has been receiving regular pension payments under the OPP at the rate of $4,641.03 per month or $55,692.36 per year. His pension payments were computed on the basis of his gross compensation, including taxes and payments "in lieu of vacation."

This computation was wrong in two respects. In the first place, as has already been discussed, he was not entitled to any pay in lieu of vacation. Moreover, even if he had been, his pension should have been based on his "salary," which does not include additional payments for any vacation time sacrificed.

Secondly, and more significantly, Curran's pension payments should have been computed on the same basis as his salary—i. e., first computing the net pension payments on the basis of the net salary, then determining the gross amounts necessary to cover the net pension payments plus the taxes due on the gross amounts. Instead, by computing Curran's gross pension payments on the basis of his gross salary, the trustees have given him, in addition to his net pension, amounts sufficient to pay more taxes than he will actually owe on his gross pension. In other words, since Curran's gross pension payments are less than his gross salary, the income taxes on the pension payments will be computed at lower rates than the taxes which the NMU formerly paid on his gross salary. Moreover, since Curran is now residing in Boca Raton, Florida, he will presumably have to pay proportionately lower state income taxes, and no city income taxes at all.

For example, assuming that Curran's salary was $30,000 "net" for each of the 26 years through 1963, and was $40,000 "net" during 1964–1968, $44,000 "net" during 1969 and 1970, $46,640 "net" in 1971, and $48,972 "net" in 1972 and for the first two months in 1973, his total "net" salary for 35 years of service would have been $1,171,774. His proper annual "net" pension would be 2½% of that total, or $29,369.35.

The gross pension payments of $55,692 per year being made to Curran exceed this estimate of his proper net pension by $26,-323, which is far more than the total federal and state income taxes which would be payable on an annual income of $55,692. Curran's net pension should be computed in the manner indicated and the gross pension should then be determined by adding to the net pension an amount sufficient to pay the federal and state (and local, if any) income taxes on the gross pension. Curran shall make full restitution, with interest, for the past overpayments, and his future payments will be reduced to the proper level.

### b. Haddock's pension

Hoyt Haddock, a lifetime personal friend of Curran, was for many years a Wash-

ington lobbyist employed as Executive Director of the AFL–CIO Maritime Committee (ACMC) an organization funded primarily by the NMU. He was also employed as Co-Director of the Labor-Management Maritime Committee (LMMC), an organization jointly funded by the AFL–CIO Maritime Committee and by the shipowners. He received salaries from both the ACMC and the LMMC.

He was never directly employed by the NMU, nor ever a member of the NMU although, as previously mentioned, he was furnished a Cadillac automobile paid for by the NMU Fighting Fund, which also paid all of the expenses of running and maintaining it.

Haddock retired in 1972. Since that time, in addition to receiving Social Security Benefits, he has been receiving pensions from both the ACMC and the LMMC.

On top of all this, since October 1, 1972 he has been receiving a $300-per-month pension from the NMU, and on September 30, 1972 was given a lump-sum payment of $1200, apparently as retroactive pension for the preceding four months.

Since Haddock was clearly not entitled to a pension under either the OPP, the SPP or the Deep Sea plan, his pension payments have come from the NMU general fund.

The payments commenced after Haddock wrote Curran complaining about the inadequacy of his retirement income. The pension payments to Haddock were voted by the National Office and approved by the Union members at port meetings in July 1972.

■ Under the circumstances, the Court cannot conclude that the payments constitute a violation of trust by the defendant officers.

c. *Other pensions*

The record does not reflect whether other officers are also receiving, under the OPP, pensions computed on the basis of their total compensation, including pay "in lieu of vacation." If so, their pensions should be recomputed to eliminate this element of the base compensation.

### OVERFUNDING OF THE SPP

Not surprisingly, there was a direct conflict in the testimony of the expert witnesses of the opposing parties, respecting whether the SPP was overfunded and whether the contributions thereto from the NMU general fund should be reduced below the current level of 26% of the salaries of the covered employees.

The usefulness of much of this testimony has been substantially reduced if not destroyed by the fact that it was based upon the assumption that pension payments, including lump-sum payments, would be continued at the present levels—an assumption which this decision has rendered invalid.

■ Following approval of the revised SPP, it will be directed that an independent actuarial firm, acceptable to the NMU and to plaintiffs, be employed, at the expense of the NMU general fund, to render a written opinion as to whether the funds of the SPP are sufficient to pay the anticipated pension obligations and whether a 26% level of contributions is necessary to maintain the sufficiency of the fund. If the parties are unable to agree upon an actuary, the Court will appoint one. The Court will accept and adopt the opinion of the actuary.

### TRANSFER OF GENERAL FUNDS TO THE "FIGHTING FUND"

■ The evidence established numerous transfers of funds between the NMU general fund and the Fighting Fund, but such transfers were satisfactorily explained. The Court concludes that plaintiffs have failed to establish that moneys of the general fund were misapplied for political purposes.

### SUMMARY

The record of this case is a sorry chronicle of the arrogance of privilege and the callous betrayal of trust. Even as the American shipping industry was in sickening decline, with the membership of the NMU dwindling to a fraction of its original strength

and the number of jobs plummeting even more precipitously, the national officers, although generously paid, were improving their lot with expensive perquisites, including expense-paid vacation junkets on top of pay "in lieu of vacation," accounting-free "allowances" on top of virtually unlimited expense accounts, and with retirement income exceeding their highest salaries while working.

The Union's president, Joseph Curran, fully capitalizing on his popularity and power, enjoyed particularly favored treatment, having a large share of his personal expenses paid, receiving pay "in lieu of vacation" after having taken more than the allotted vacation time, and receiving a pension based on his gross compensation, including the income taxes that the Union had paid for him, and the unearned pay "in lieu of vacation."

Curran must make full restitution to the NMU for:

1. All income tax refunds received by him for the years 1963 through 1972.

2. All taxes paid by the NMU on his outside income.

3. All severance pay retained by him, after payment of all income taxes on his gross severance pay, above the proper net amount of $142,835.

4. All net pay "in lieu of vacation" received by him.

5. The amount of $7,527.97 paid for legal services on his behalf.

6. All pension money retained by him, after payment of all income taxes on his gross pension, above the authorized level (approximately $29,369 net per year, the exact figure to be determined by the accounting).

7. All costs paid by the NMU for his travel between New York and his home in Boca Raton, Florida.

All of the defendant officers, including Curran, must make full restitution to the NMU for:

8. All of the weekly "allowances" given to them by the NMU without an accounting of their expenditure thereof.

9. All their foreign travel except that which they can show was reasonably required for specific Union business. Upon an offer of proof, the matter will be referred to a Magistrate for hearing and report.

10. Any portion of their pensions based on pay "in lieu of vacation."

William Perry must make full restitution to the NMU for the $9,294.82 given him as pay "in lieu of vacation" at the time of his termination.

An accounting will be conducted to determine the amount of all the foregoing items for which specific amounts are not indicated. Interest at the rate of 6% per annum will be charged on all such amounts from the date of their receipt by a defendant to the date of the judgment order. The SPP will be revised as indicated.

Plaintiffs shall submit a judgment order to be settled on twenty days' notice to defendants.

## OPINION AND ORDER

CONNER, District Judge:

All of the active parties, as well as a retired NMU member, Edward Pogor, have filed motions to amend or for reconsideration of this Court's Opinion dated July 27, 1979 ("the Opinion"), and of its Order dated August 8, 1979, and the Court has considered the extensive affidavits and memoranda filed in connection therewith. The Court's disposition of such motions is as follows:

## PLAINTIFFS' MOTIONS

1. *Re Strassman and Nesbitt*

At page 36 of its Opinion, the Court stated:

"Defendants Strassman and Nesbitt were apparently not personally served and have not voluntarily appeared; accordingly, they will not be bound by the judgment herein."

Plaintiffs contend that Strassman and Nesbitt entered their appearances through the attorneys who represented all of the defendants except Joseph Curran and therefore should be bound by the judgment. The record does not sustain that contention. The marshal's return of service indicates that neither Strassman nor Nesbitt was served, despite at least two unsuccessful attempts on each. Separate answers to the original complaint were filed by Joseph Curran, by Martin E. Segal, and by Abraham E. Freedman, and a joint answer was filed by Mel Barisic, Rick Miller, James Martin and Peter Bocker. No answer was ever filed by Strassman or Nesbitt.

The first mention of either Strassman or Nesbitt thereafter in the pleadings file was in listing them among the other defendants in the heading of defendants' supplemental answers to interrogatories filed in March 1974, over a year after the complaint was filed. This was after the original attorney of record, Abraham E. Freedman, who was general counsel of the NMU as well as a defendant in the case, had been replaced by outside trial counsel, George Koelzer. Thereafter the names of Strassman and Nesbitt were similarly included with those of the other defendants in the headings of two memoranda of law filed in January and February of 1975 in opposition to motions to amend the complaint and for a separate trial of certain issues, and in the headings of two notices of taking deposition filed in February and December of 1975. Their names were also included in the list of defendants represented by counsel in the transcripts of some of the pre-trial depositions and in some letters of defendants' counsel to the Court, as well as in defendants' post-trial briefs.

However, that such inclusions were merely inadvertent seems evident from the omission of their names from other papers, most significantly from the heading of defendants' answer to the amended complaint filed in March of 1975. Such occasional and apparently inadvertent inclusions of the names of Strassman and Nesbitt are clearly insufficient to give the Court personal jurisdiction over them.

While, as officers of the Union, Strassman and Nesbitt were undoubtedly aware that the action had been filed and that they were named as defendants, such knowledge is not a substitute for service on them. If it were, no motion under Rule 12(b)(2), F.R.Civ.P., could ever be granted, and the rule would be a nullity.

There was nothing in the file of the case tending to indicate that either Strassman or Nesbitt ever saw any of the papers in which their names were listed among the defendants in whose behalf the paper was being filed, or that they were even aware of such inclusion. While they undoubtedly knew that Freedman and later Koelzer were defending the action on behalf of at least some of the officers other than Curran, there is no evidence that they ever authorized either attorney to represent them, or that they were ever consulted in connection with the defense.

It is unfortunate that plaintiffs' counsel did not pursue further efforts to obtain service on Strassman and Nesbitt because, even if these two defendants continued to be successful in evading personal service, the Court would surely have approved some form of substituted service, for example by registered mail. Although both of them were apparently residents of New Jersey at the time the action was commenced, as officers charged with misapplication of the funds of a union headquartered in Manhattan, they were clearly subject to service under the New York long-arm statute, CPLR § 302. However, the mere fact that they could readily have been served does not dispense with the necessity of actual service.

If Strassman and Nesbitt had themselves done anything, even inadvertently, which created the reasonable impression that they were submitting to the Court's *in personam* jurisdiction, thereby causing plaintiffs' counsel to forego an obvious opportunity to serve them, the Court might properly treat their conduct as a voluntary appearance, but there is no evidence that they themselves—as distinguished from the defend-

ants' attorneys—did anything to estop them to deny personal jurisdiction. Under these circumstances, it would be manifestly unfair to Strassman and Nesbitt to bind them by the judgment even if the Court had the power to do so, which it does not.

The above-quoted portion of the Court's Opinion will therefore remain unchanged.

2. *Re Deep Sea pensions*

At page 54 of the Opinion, it was stated:

"However, an officer who put in sufficient time at sea to earn a seaman's pension would have less time as a Union officer and would accordingly receive a proportionately reduced pension from the SPP."

Plaintiffs assert that this statement is incorrect because the period of service as a Union officer (originally all such time but now only the first five years) is counted for the purpose of determining eligibility for a Deep Sea pension.

Plaintiffs' argument is a *non sequitur.* Although some (originally all) of the time as an officer is credited against a Deep Sea pension, the reverse is not true. Time as a seaman is not credited in determining the amount of pension benefits under either the Officers Pension Plan or the Staff Pension Plan. The longer the time a man spends in covered employment under the Deep Sea plan, the lower will be his pension as an officer. Because the officers' pensions are much greater than the Deep Sea pensions, it is unlikely that an officer's Deep Sea pension would exceed the amount by which his officer's pension was reduced because of the time he spent as a seaman before he became an officer. Thus, in determining the reasonableness of the officers' pension plans, the fact that some of them are also eligible for Deep Sea pensions may be disregarded.

3. *Re personal automobiles*

At pages 48–49 of the Opinion, it was stated that plaintiffs' claim that the provision of automobiles for the personal use of NMU officers constitutes a misuse of Union funds was expressly excluded as an issue in

this case, and had been asserted in a later-filed action between the same parties then pending before Judge Ward of this Court.

Plaintiffs now state that "That claim in the action before Judge Ward was withdrawn, without prejudice, because proof on that issue had been submitted in this action."

The withdrawal is unfortunate and inexplicable because during the trial of this action it was repeatedly stated that the issue of the personal automobiles was no longer in this case. It would be manifestly unfair to defendants for the Court to decide the issue on the basis of the present record, after defendants had been led to believe that in this case they need adduce no evidence on that issue.

If plaintiffs are unable to reassert this claim in the action before Judge Ward, and are willing to stand on the present record in this case, they may move to reopen the trial to permit defendants to introduce any evidence they may have in opposition to the claim. In opposition to such motion, defendants will, of course, be permitted to demonstrate any prejudice to them resulting from the delay in the trial of this claim.

4. *Re surcharge*

At pages 40–41 of the Opinion, the Court stated that "during the trial of this action plaintiffs, with the approval of the Court, expressly waived any claim of surcharge."

Plaintiffs' counsel Arthur E. McInerney asserts that it was his intention to waive surcharge only with respect to the alleged excessiveness of Curran's pension. It is true that the oral waiver occurred during a discussion of "the question whether the issue of Mr. Curran's pension benefits is properly before the Court." (Transcript ("Tr.") 216). The Court indicated that it would permit plaintiffs to adduce evidence on the issue, and that if the defendants "feel you have been prejudiced in any way because of a failure to get more specific notice, I will make sure you are not harmed by giving you the right to come in after we adjourn here to bring in any evidence you want to bring in, bearing on these issues"

(Tr. 221) and that "[i]f you want more discovery after the trial, you may have it." (Tr. 222). Mr. George Koelzer, the attorney for the non-Curran defendants, then stated, "My position is slightly different and I accept the Court's ruling \* \* \*. However, the gentlemen I represent conceivably now, in the light of the Court's ruling a few moments ago, could be liable for a surcharge. That has never been raised \* \* \*. [T]here has not even yet been intimated in any papers anywhere on file that I know of that there would be any conceivable claim for surcharge against my defendants in the event the Court did rule that the Curran benefits were excessive." (Tr. 222–23).

After further discussion, the Court asked plaintiffs' counsel, Mr. McInerney, "Whether he is really claiming surcharge." He responded, "I will take the charge of Mr. Koelzer's client[s] out of it."

After some clarification, the Court stated "All right. The issue of surcharge is out then." Mr. McInerney quickly added, "Except for Mr. Curran." (Tr. 227–28).

Curran's counsel, Mr. Dooley, then interjected, "If the surcharge is out, Joe Curran is out there alone bearing the cost of this suit and if that isn't prejudice, I don't know what prejudice is." The Court responded, "You can brief this after trial as to whether the surcharge is in or out. We will go ahead and receive evidence now as though it is in." (Tr. 228).

From the context of the discussion in which the waiver was made, it seems clear that Mr. McInerney did intend to waive a claim of surcharge against the non-Curran defendants only with respect to Curran's pension benefits.

In their main post-trial briefs, the parties did not discuss the issue of surcharge; plaintiffs merely proposed conclusions of law to the effect that all of the defendants except Perry would be surcharged for all the expenditures made in violation of Section 501. Moreover, even in their present submissions, the parties cite no authorities either supporting or opposing the availability of surcharge as a remedy in this case.

There is a serious question whether surcharge of the non-Curran defendants would be appropriate in this case, whether or not the claim of surcharge against them was waived.

Section 501 does not mention surcharge but merely states that, after obtaining Court authorization, a union member may sue "to recover damages or secure an accounting or other appropriate relief." Nor is there any reference to surcharge in the legislative history of the LMRDA, in which "the question of remedies was given scant attention." Clark, *The Fiduciary Duties of Union Officials Under Section 501 of the LMRDA*, 52 Minn.L.Rev. 437, 470 (1967). And it is interesting that in a section of the Clark article entitled "Remedies Envisioned by Section 501(b)" there is no mention of surcharge.

The only case which the Court has been able to find in which a union officer or trustee was surcharged for monies improperly paid to others is *Morrissey v. Curran*, 483 F.2d 480 (2d Cir. 1973), *cert. denied*, 414 U.S. 1128, 94 S.Ct. 865, 38 L.Ed.2d 752 (1974). In that case, the Court of Appeals affirmed the judgment of Judge Dudley Bonsal of this Court surcharging Abraham E. Freedman, a trustee of the Officers Pension Plan, for retirement benefits paid to William Perry who, although he had served as Assistant to the President, Joseph Curran, had never been an officer of the Union.

The Court cited no prior decisions in support of its ruling, but merely stated that the record amply supported Judge Bonsal's finding that Freedman had shown a "reckless indifference" to his duty as trustee and that the issue of Perry's entitlement to an officer's pension did not involve "complex legal questions on which reasonable men could disagree." 483 F.2d at 484–85.

In the rather unusual circumstances of the present case, surcharge of the other officers for monies improperly paid to Curran seems inappropriate in view of Curran's virtually absolute dominance of the Union. The other officers were not directly involved in authorizing most if not all of the challenged expenditures and they probably

could not have stopped them if they had tried. Even if they went directly to the Union membership and attempted to obtain support for stopping the expenditures, they might not have been successful and they would doubtless have been omitted from the slate of nominees for the next election if, indeed, they had not been removed before that time.

Moreover, the Court, in deciding that the action had not been barred by laches, relied heavily on the fact that surcharge had been waived. It would be manifestly unfair to permit plaintiffs to delay instituting action for a number of years while the defendant officers failed to protest the making of payments which, while improper, did not directly benefit them, and then charge them personally for all the monies so disbursed, without giving them notice of the claimed impropriety and an opportunity to attempt to rectify it and curtail their liability.

■ The Court therefore will not surcharge any of the non-Curran defendants in this action. Each will be liable only for the monies improperly disbursed to him or for his benefit, with interest from the date of disbursement. Curran, of course, will be surcharged only for improper expenditures made prior to his retirement on March 1, 1973.

### 5. *Re Defendants' Attorneys' fees*

Plaintiffs have further moved for an order enjoining defendants from employing in this action counsel paid or to be paid with funds of the NMU, and directing them and their counsel to return any such sums heretofore paid to them.

In response to the motion, defendants have filed the affidavits of Seymour Waldman of the law firm of Waldman & Waldman, who have recently been substituted as attorneys for the defendants Wall, Barisic, Martin, Miller and Bocker; of Selvyn Seidel of the firm of Hale Russell Gray Seaman & Birkett, who have recently been substituted as attorneys for Curran; and of Ned R. Phillips of the law firm of Phillips & Cappielo, who are presently counsel to the

NMU. The Waldman and Seidel affidavits assert that none of their legal fees or disbursements on behalf of the defendants they represent are being paid for by the NMU. The Phillips affidavit asserts that the NMU counsel have performed no services on behalf of the defendants in the litigation and will perform none in connection with the appeal, and that no legal fees or disbursements of counsel for defendants in this action have been paid by the NMU except for approximately $15,400 which was paid to Mr. Koelzer's firm, "representing only a minor part of the services rendered by them in this extensive litigation," which was paid "only after many charges against the individual defendants were withdrawn or dismissed."

■ The Court agrees with defendants that, under the circumstances, the injunction which plaintiffs seek is unwarranted. Counsel for the Union apparently recognize that it is improper for the Union to advance funds for the defense of its officers against charges of breach of fiduciary duty. If the officers are exonerated, they may apply to the Court for reimbursement from Union funds. See Note, *Counsel Fees for Union Officers Under the Fiduciary Provision of Landrum-Griffin*, 73 Yale L.J. 443 (1964). It is premature to consider the possibility of reimbursement in this case until after disposition of any appeals.

### 6. *Re the Resolution of August 27, 1979*

Plaintiffs have asked the Court to declare null and void the resolution of the New York Port Meeting of the NMU on August 27, 1979 which purported to exculpate the Union officers for their payment to themselves of $100 monthly allowances. The resolution recited that the Court had "arbitrarily disregarded" the use of such allowances for "legitimate union expenses," and that the membership knew and approved of the allowances and was of the view "that the Union should be administered by its officials, not by the court." It was therefore resolved that the membership ratify "the constitutionality and the practice" of the allowance "past, present and future."

Plaintiffs assert that this resolution violates Section 501's express prohibition of general exculpatory provisions.

The Court does not agree that the resolution is a general exculpatory provision of the type proscribed by Section 501—that is, one which anticipatorily exonerates the officers from any future violation of their fiduciary responsibilities. However, it does purport to ratify past practices which the Court has found to be a violation of Section 501. Defendants' counsel nevertheless asserts that "no defendant has sought to rely upon that resolution or to utilize it in any way in exculpation of the judgment to be entered by the Court."

Unless and until that happens, the validity of the resolution is not before the Court for consideration. The Court's Opinion stands, in no way nullified by the resolution.

## CURRAN'S MOTION

Defendant Curran has moved for reconsideration of that portion of the Court's Opinion which rules that Curran's pension should have been computed on the basis of his "net" salary rather than on the basis of his "total compensation," including the federal, state and local taxes paid thereon.

The motion is granted to the extent that the Court has reconsidered the matter, but the Opinion will not be amended as urged by Curran.

The Court cannot accept Curran's reasoning. Curran was voted a "net" salary in a specified annual amount. The Court concluded that this obligated the NMU to pay all of the federal, state and local income and social security taxes on his income, giving him the specified amount as take-home pay.

The Officers Pension Plan and the successor Staff Pension Plan both provided for pensions in an annual amount equal to 2½% of the pensioner's "average" salary for each year of service up to a maximum of 40 years (at which point the pension would equal the "average" salary). In computing the "average" salary under either plan, only the more recent periods of employment (when the officer's salary was invariably higher) were considered.

The scheme of both pension plans was thus to provide a prescribed ration between an officer's retirement benefits and his salary as an officer, the ratio being directly proportionate to his number of years of service. For an officer with 35 years of service, as Curran had, the pension benefits are fixed at 35 times 2.5% or 87.5% of his "average" salary as an officer.

In the case of all of the officers except Curran, there can be no doubt as to how the computation should be made. They received a regular or "gross" salary, out of which they paid their own income taxes. Their pension benefits obviously should be computed on the same basis. If one of them retires after 35 years of service, his pension is 87.5% of his "average" salary, and he will continue to pay his own income taxes thereon.

No specific provision was made in the plan for someone who was paid a "net" salary. But it seems logical that the pension benefits should be computed in the same way as the salary—in Curran's case an amount sufficient to leave him, after payment of all income taxes thereon, a "net" pension equal to 87.5% of his "average net" salary.

If, instead, as Curran urges, his gross pension benefits were computed at the rate of 87.5% of his gross compensation (including all federal, state and local taxes paid on his behalf by the Union), his net retirement benefits (after he had paid all taxes on the gross amount) would be greater than 87.5% of his "average" net salary as an officer. This is because, as a retiree, he would be in a lower income tax bracket.

The only way to preserve the prescribed ratio between his retirement benefits and his salary as a Union officer is to compute both on the same basis—that is, to give him gross pension benefits sufficient to leave him, after payment of all the income taxes thereon, a net amount equal to 87.5% of his "average" net salary as an officer. This is what the Court provided in its Opinion.

Curran further contends that the Court should not have ordered on August 8, 1979 that, pending the entry of a final order, Curran would be paid pension benefits "in the amount of $2,447.42 net per month." It has been computed by Kipnis & Karchner, accountants for the NMU, that a gross monthly payment of $3,094.92 will leave Curran $2,447.47 net per month after taxes. Before the order in question, Curran had been receiving $4,641.03 per month, or $1,546.11 more.

Curran's position is that the Court had no power to enter an "interim order" which is injunctive in effect, and which is designed to recoup past overpayments, before a decision on appeal and even before final judgment in this case, without a showing of irreparable harm.

Curran ignores the circumstances under which the order was entered. The Court had rendered an Opinion to the effect that, in the 6½ years since his retirement, Curran had received a total of some $120,000 in excessive pension benefits (not to mention hundreds of thousands of dollars in additional improper payments). The trustee of the Staff Pension Plan was in doubt whether, under the circumstances, pension payments to Curran should continue at all pending the appeal. The trustee understandably did not wish to expose itself to a claim of surcharge if the Court's determination that the previous level of payments was excessive was upheld on appeal, and the continuing overpayments could not be recouped.

In order to avoid financial hardship to Curran in the interim, the Court ordered that benefit payments, at the level which the Court had determined to be proper, continue pending the entry of final judgment. The reduction was not for the purpose of recouping past overpayments, but only for the purpose of preventing any further overpayments. Recoupment, if ultimately deemed appropriate, will come later.

The Court's order of August 8, 1979 will stand.

## MOTION OF DEFENDANTS WALL, BARISIC, MARTIN, MILLER & BOCKER ("DEFENDANTS")

Defendants have moved for reconsideration of the three rulings of the Opinion adverse to them.

### 1. Re the Staff Pension Plan ("SPP")

Defendants have made a series of attacks on the Court's ruling that the SPP, considered in conjunction with the substantial severance pay which each retiring officer or staff member receives, is unreasonable because together they provide retirement income which may exceed the retiree's highest salary while working.

Defendants first assert that they did not know that the reasonableness of the pension plans was an issue before the Court and accordingly did not introduce any evidence thereon. Defendants' professed surprise is itself surprising. Judge Carter's order authorized an action, inter alia, "For an accounting of the NMU Officers' Pension Fund." The Amended Complaint alleged in Paragraphs 33 and 34 that the officers' pension benefits were "unfair to the membership and * * * overgenerous and improper" and sought a determination of "fair pension benefits." In this Court's Memorandum of May 19, 1977, the section entitled "Officers Pension Plan (OPP)" began with the statement:

"Plaintiffs contend that the pensions paid to Union officials by the OPP are excessive * * *."

The section concluded:

"Before the Court can rule on this issue, or on the reasonableness of the pensions themselves, it must have before it the kind of comprehensive evidence presented to Judge Pollack in Puma v. Brandenburg, supra. Therefore defendants' motion to dismiss this claim must be denied at this time." (Emphasis added).

That Memorandum was filed after the conclusion of plaintiffs' case, six and a half months before defendants were required to begin the presentation of their case and over eight months before they rested.

Defendants were thus put on specific notice that the reasonableness of the pension benefits was a live issue, at a time when they had ample opportunity for preparation to present any evidence they had bearing on the issue. They did not avail themselves of that opportunity. Thus, as the Court observed in its Opinion, it was left with no evidence, other than the plans themselves, and the financial records of the NMU, on which to base a determination of reasonableness. The Court was thus compelled to make the determination merely by comparing a pensioner's retirement income to his salary.

Now, in their Motion for Reconsideration, defendants have come forward with a considerable mass of material which they assert they would have presented if they had known that the issue was being litigated. In the spirit of informal truth-seeking which has characterized these proceedings, the Court will treat this as an offer of proof and will reconsider the issue in the light of such additional evidence.

Defendants also assert that they did not know that the officers' severance pay would be taken into account in determining the reasonableness of the SPP. That is perhaps unfortunate but surely unpersuasive. Where the severance pay is as large as it has been here, it becomes part of a retirement benefits "package" which must be considered in its entirety. For example, Joseph Curran was given a lump sum severance payment of $142,975 *after taxes* ($409,975 before taxes). Mel Barisic, who retired as Secretary-Treasurer in 1978, received $147,339 (before taxes). Such amounts cannot be airily dismissed as "relocation expenses," as defendants seek to do.

However, defendants do make a valid point which the Court had not mentioned in discussing, at page 55 of its Opinion, the level of retirement income which could be generated by investment of the severance pay, namely, that the severance pay is subject to income taxes in the year in which it is received, unless it is "rolled over" into an individual retirement account ("IRA").

Defendants further assert that the Court's computations of retirement income based on illustrative employees who had up to 40 years of service at the time of retirement are unrealistic, because no officer or staff member has yet retired with more than the 35 years of service which Joseph Curran had at the time of his retirement. Of all the present officers and staff members, only two employees, both secretaries, will have had 40 years of service by the time they reach the retirement age of 65. The five present officers will have had from 25 to 38 years of service by age 65.

Finally, defendants point out that, effective June 30, 1978, the severance pay structure was modified to impose much lower limits on the payments. Under the scheme in effect theretofore, each retiree who had more than six years of service received one month's pay for each year of service. Under the new arrangement, retirees with less than 25 years of service as of June 30, 1978 are limited to a maximum severance pay equal to 12 months' salary, while those with more than 25 years' service—the NMU president, Shannon Wall, and two others—are limited to a higher maximum equal to 24 months' salary.

Defendants omitted to mention that within a few months before June 30, 1978, most of national officers, including the defendants Barisic, Martin, Miller, Bocker, and Nesbitt, resigned. It seems obvious that the motive for their sudden mass exodus was to beat the deadline for reduction of the severance pay, and perhaps avoid other limitations on retirement benefits which might be imposed as a result of the Court's then-pending decision in this case. The unseemly haste of their departure may be appreciated from the fact that Barisic was only 56 years of age at the time of his retirement, Martin was 58, Miller 51, Bocker 52 and Nesbitt 60.

Thus the reasonableness of the retirement benefits "package" must be considered not only on the basis of the revised severance pay structure, but also on the basis of the benefits given those who "jumped ship" to beat the reduction.

Of the five officers who resigned shortly before June 30, 1978, Barisic received the highest severance pay, $147,339 before taxes or $99,389 after taxes. He has indicated his election of an optional lump sum payment in lieu of pension, in the amount of $359,840, although he has not yet received it. Assuming that this entire amount was received in the same year, it would be subject to federal and state income taxes in that year. Assuming further, for purposes of discussion, that the entire amount was subject to taxation at the maximum federal rate of 70% (a reasonable assumption if that amount was received the same year as the severance pay), a balance of $107,952 would remain after taxes. Lumping this with the $99,389 after-tax balance on his severance pay would bring his total retirement capital up to $207,341. Investing this amount in high-grade corporate bonds would yield him total retirement income of slightly more than $20,000 a year, without invading the principal. This is far less than the regular pension of $29,329 to which he was entitled, in addition to the income he could earn by investing his severance pay. Thus, it is obvious that he would not have elected the lump-sum option without the intention of rolling it over into an IRA.

If the $507,239 total of his $147,339 severance pay and his $359,840 lump-sum pension were rolled over into an IRA, no income taxes would be payable thereon at the time of retirement. However, defendants assert that this would severely limit the types of investment that could be made, adding that

"Virtually the only permissible investment for an IRA is a bank savings account. See Section 408(a)(2)."

But Section 408(a)(2) of the Internal Revenue Code (Title 26) says no such thing. It only requires that the IRA funds be placed in trust with a bank as trustee. IRA trustees permit a wide spectrum of investment options, designed to appeal to clients with a wide range of investment needs and tastes.[1]

The record reflects no reason why IRA funds cannot be invested in high-grade corporate bonds, for example, to yield 10% or more at current market prices. Thus Barisic would be able to obtain retirement income of over $50,000 a year, plus his Social Security benefits and Deep Sea pension and still leave an estate of over half a million dollars to his beneficiaries.

And Barisic retired prematurely at the age of only 56. If he had continued to work to the normal retirement age of 65—when he would have had 35 years of service instead of 26.5—his regular pension would have been 87.5% of his "average" salary, rather than 66.25%. If he received raises at an average annual rate of 6% during the additional 8 years of his employment, he would have retired at an annual salary of $103,600; his "average" salary would have been about $92,000 and his regular pension would have been about $80,500 a year.

Alternatively, he could elect a lump sum payout of approximately $693,000 using the 6.5% interest assumption and a 13-year life expectancy.

In addition, even under the newly reduced severance pay scheme, he would be entitled to severance pay equal to 24 months' salary, or $207,200, bringing his total lump sum receipts at the time of retirement up to $900,000.

Rolling this entire amount over into an IRA would avoid any income taxes at that time and permit its investment to yield up to $90,000 a year in retirement income, exclusive of his Social Security benefits and Deep Sea pension, while leaving almost a million-dollar estate intact for his beneficiaries. By retiring early, he gave this up, but obviously only because he wanted to take advantage of relatively even higher benefits while he could still do so.

The Court sees no reason to change its original decision that the pension benefits

1. The Court cannot fail to take judicial notice of facts within the personal knowledge of the Court. The writer's own Keogh-plan funds were (unfortunately, so far) invested in the "Scudder Special Fund," whose portfolio is concentrated in "go-go" common stocks. The trustee, State Street Bank and Trust Co. of Boston, imposed no apparent restrictions on the type, grade or yield of the securities.

in effect until June 30, 1979 are so excessive as to constitute a violation of Section 501.

The Court does believe that the reduction of severance pay which went into effect for all but three employees on June 30, 1978 has gone a long way toward reducing the overall benefit package to a reasonable level. For example, an employee who retires at age 65 with 35 years' service, during the last five years of which he received annual raises averaging 6%, would receive a regular pension equal to 76% of his final (highest) salary. In addition, he would receive severance pay equal to one-year's salary, which could be rolled over into an IRA and invested in high-grade bonds to bring his total retirement income up to 86% of his top salary, in addition to his Social Security and Deep Sea pension, if any. While this is high, it is not so high as to shock the conscience of the Court, which cannot disregard the moderating effect of the chronic monetary inflation which will almost certainly continue for the predictable future.

However, if the same officer retired after 40 years' service, he would have retirement income equal to 97% of his highest salary, plus Social Security and Deep Sea pension, a level which could be raised even higher by electing the lump-sum pension option, in view of the anachronistic 6½% interest assumption used in computing the present value of future payments. This does seem an inordinately high ratio of retirement benefits to salary.

The Court therefore believes that, in addition to the reduction in severance pay, the pension ceiling should be set at 35 years' service instead of 40. This will affect only a handful of the present employees.

The Court further believes that the reduction in severance pay should affect *all* employees rather than exempting the three who had had 25 years' service as of June 30, 1978. It is surely no mere coincidence that Shannon Wall, the current NMU president, was one of the three persons who will enjoy this favored treatment. This is disturbingly evocative of the favoritism accorded his predecessor, Joseph Curran.

One final modification of the pension structure should be made. At page 55 of its Opinion, the Court stated that the lump-sum and accelerated payment options permitted even greater retirement income "because the present value of the anticipated future payments is computed on the basis of assumed interest rates—until 1976 only 3% per annum and currently 6½%—which are grossly incommensurate with the yields now prevailing in the money markets." Defendants argue that instead of determining the proper discount rate by reference to the yields available on high-grade fixed income securities, the Court should look instead to the overall yield actually being realized on the investment of the pension funds. Because many of the fund's securities were purchased in an era of much lower yields than are obtainable today, the fund realizes an average return of about 6.5% on its principal. It would, of course, be useless to sell the lower-yield securities and reinvest the proceeds in higher-yield securities, because the market value of the former has dropped in substantially exact proportion to their yields.

It is precisely for this reason that defendants' premise is unsound. When a lump-sum payment is made to a retiree, the cash is not raised by selling the fund's older, lower-yielding securities. Instead, in a well-managed fund, there will be a certain amount of more liquid funds available, for example, in short-term certificates of deposit or treasury bills. If the pensioner did not elect, or the committee did not approve, a lump-sum option, these funds would be available instead for investment at the *then-current* yield rates. If the fund can put this money into high-grade corporate bonds at a yield of 10%, it is nothing less than waste for them to approve a lump-sum option on which the fund makes an interest deduction of only 6½% per annum.

The fund's loss becomes a windfall to the pensioner, who can invest the lump sum to earn the same 10% the fund could have earned.

Thus, whether viewed from the standpoint of what the pensioner gets or from

68

the standpoint of what the fund gives up, the interest assumption should be based on the yields obtainable on high-grade fixed income securities during the life expectancy of the pensioner. This involves some prognostication, but doubts should be resolved against the one who elects a lump-sum option, rather than against the fund, as they now are.

 Pending modification of the pension plan in the respects discussed above, the Court adheres to the relevant portion of its Opinion.

### 2. Re the $100 Weekly Allowances

In its Opinion, the Court concluded that the $100 per week "allowance" which each officer has received without being required to account therefor was merely an unauthorized increase in compensation because each officer was furnished credit cards with which to charge expenditures for Union purposes, and also was reimbursed for all cash disbursements for such purposes, so that the cash "allowance" was wholly redundant.

Defendants assert that they did not understand that this "allowance" was among the "miscellaneous expenses" which the Court, in its Memorandum of May 19, 1977, indicated were still in issue.

It is true that the Court, in giving certain examples of the disputed personal expenses in its Memorandum, did not specifically refer to this allowance. But the Memorandum posed the issue in terms broad enough to include the allowance. The Court stated that plaintiffs "did introduce evidence that many personal items for Union officers were paid for by the Union;" that "[c]learly these payments for personal needs were compensation to officers in excess of that approved by the National Council and the Union membership;" and that "defendants should respond to plaintiffs' proof with evidence as to the pattern and practice of payments from Union funds for officers' personal expenses, including travel costs."

Nevertheless, again consonant with its objective of getting the facts without the hindrance of procedural formality, the Court will treat defendants' statements respecting the evidence they could have introduced as an offer of proof and will reconsider the issue in the light of this additional input.

Defendants first suggest that the allowances must be proper because they are reported to the Secretary of Labor on the Union's annual LM–2 reports. But the Department of Labor has no way of determining whether the allowances are spent for Union purposes or on personal expenses.

Defendants next point out that the Court was unable to determine how the allowances were expended, and assert that they were intended to cover minor cash expenses such as taxi fares and local telephone calls, which could not be charged on a credit card, and which were too small to justify the preparation of an expense voucher in order to obtain reimbursement from the Union.

The Court confronted this issue in its Opinion and concluded that the officers undoubtedly had some minor expenses for Union purposes which were not charged to or reimbursed by the Union, but the amount of these expenses was almost certainly exceeded by the amount of the officers' personal expenses, for restaurant meals and the like, which were charged to the Union. For example, William Perry testified that Union officers routinely applied for reimbursement for meals which he had paid for with Union funds. The officers validated their own expense vouchers and no one ever challenged them.

Defendants further point out that the officers of several other unions also receive a weekly cash expense allowance, notwithstanding the fact that they are provided with credit cards and are reimbursed for vouchered expenses. But the commonality of a practice is no guarantee of its propriety. The other unions which provide such allowances may have established accounting or oversight procedures to prevent their misapplication for personal expenses. On the record before it, the Court could not possibly determine the similarity of the practice in other unions, even if it were

prepared, which it is not, to take the next step and conclude that because other unions act in this fashion, it is acceptable behavior for the NMU.

Defendants finally point out that the evidence established that the $100 weekly cash allowance was instituted in 1971 as a substitute for the individual automobiles which had theretofore been furnished to a number of the officers. However, the furnishing of the individual automobiles is itself the subject of challenge by these plaintiffs, as discussed at page 48 of the Opinion.

Defendants concede that there was never any express membership authorization for the allowances, but argue that the NMU Constitution authorizes the National Office to expend "such funds as it may deem necessary for the proper administration of the Union's affairs." This is no authorization for giving the officers an allowance which is spent for personal purposes and not on Union business. The Court is still firmly convinced that, in light of all the circumstances, the allowances in question represent nothing other than an increase in officers' compensation without the membership approval required by the NMU Constitution.

### 3. *Re Foreign Travel*

In its Opinion, the Court found that the officers and their wives have taken foreign trips which were paid for by the Deep Sea Fund, although the trips served no substantial purpose of the Deep Sea Fund or any other Union objective.

Defendants attack that ruling first on the basis that "Section 501 of the LMRDA does not extend to employee-benefit trust funds administered jointly by representatives of labor and management." Defendants add that because this issue is "legal, rather than factual" they will treat it in a separate Memorandum of Law.

However, in their supporting memorandum defendants cite only two cases on this issue, neither of which supports their position. *Cuff v. Gleason,* 515 F.2d 127 (2d Cir. 1975), was an action by a longshoreman against the trustees of a labor-management

pension trust complaining of their determination that he was ineligible for a disability pension. The Court ruled that the action must be dismissed because neither Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, nor Section 501 confers federal jurisdiction over such a claim. In the other case, *Morrissey v. Curran,* 483 F.2d 480, 484 (2d Cir. 1973), *cert. denied,* 414 U.S. 1128, 94 S.Ct. 865, 38 L.Ed.2d 752 (1974), the court did state that "[t]he language of the section [501] is clearly aimed at union officers, not trustees; nor can a trust be equated with 'a labor organization'." But this statement was in the context of a discussion of the prohibition in Section 501(a) of general exculpatory provisions in the constitution and by-laws of a labor organization. The Court concluded that Section 501 did not prevent exculpation of the trustees of a pension plan who were not union officers, except where they were guilty of "wilful misconduct." However, the Court proceeded to surcharge one of the trustees, Abraham Freedman, because, in making the challenged payments, he showed a "reckless indifference" to his duty as a trustee. The Court refused to surcharge the NMU president, Joseph Curran, as well, only because the district court had found that he had not, through his alleged domination of the trustees, forced them to make improper payments from the officers' pension fund to a non-officer, William Perry, and that finding was not clearly erroneous. The fact that, under the rubric of Section 501, the Court surcharged a non-officer *trustee* makes it clear, *a fortiori,* that they would have surcharged a union officer if he had been implicated in the misapplication of the pension funds.

The protection of Section 501 is not limited to the general funds of the Union but "extends to every area in which subversion of the interests of the union membership may be accomplished by union officials or representatives bent on acting in culpable derogation of those interests." *Hood v. Journeymen Barbers, Hairdressers, etc.,* 454 F.2d 1347, 1354 (7th Cir. 1972). The interests of the Union members obviously in-

clude the judicious husbandry of the funds contributed by the ship operator employers of union members to provide pensions for their retirement. The use of such funds for vacation travel of Union officers is clearly in culpable derogation of those interests.

Defendants further assert that the two European trips which the Court referred to in its Opinion both served a proper purpose of the pension fund, since on each trip there were meetings with retired union members living in Europe. The affidavit of Albert Franco, Administrator of the Deep Sea Fund, describes two such trips, one in 1964 and one in 1970. Franco avers that none of the travel expenses incurred on the 1964 trip were paid for with Deep Sea funds. If not, they were presumably paid from the NMU general fund, which is equally reprehensible if the travel did not serve a substantial union purpose.

Franco concedes that the expenses for the 1970 trip were paid with Deep Sea funds, but asserts that the trip was for the purpose of meetings in Madrid, London and Copenhagen with NMU pensioners. Franco states that at that time there were 313 Deep Sea pensioners in Spain and Portugal, 38 in Great Britain and 41 in "Scandinavia and the Low Countries." However, he does not say how many pensioners actually attended the meetings; nor does he mention what was discussed or what was accomplished. And, in any event, it still does not appear necessary to have taken a large number of officers and their wives for these meetings, nor was there any attempted explanation of the purpose of the side trip to Italy which Curran testified the group took.

The Court's ultimate ruling, at page 58 of its Opinion, was that the officers must make restitution for "[a]ll their foreign travel except that which they can show was reasonably required for specific Union business" and that "[u]pon an offer of proof, the matter will be referred to a Magistrate for hearing and report." The accounting which the Court has ordered will determine, inter alia, the amount expended for foreign travel of NMU officers since 1963. The officers will have an opportunity to justify

their trips if they wish; obviously they will be required to make restitution only if they cannot do so.

This does not shift the burden of proof to defendants, as they complain, but merely the burden of going forward. Plaintiffs have established a prima facie case of impropriety which defendants must now overcome if they can.

## POGOR'S MOTION

Edward Pogor, a former Security Director of the NMU who retired in November 1976, has moved for leave to intervene and for reconsideration of the Court's Opinion insofar as it states that, pending approval of a modified Staff Pension Plan, no further payments will be made on lump-sum or accelerated payment options.

He states that he desires to elect a lump-sum option and that the Court's Opinion deprives him of this property right without due process.

The Court has found that the Staff Pension Plan, considered in conjunction with the severance pay, is so excessive as to constitute a violation of Section 501. Unless this decision is reversed on appeal, either the severance pay or the pension benefits will be reduced.

Pogor has apparently already received his severance pay. If he now receives the full lump-sum payment provided by the Staff Pension Plan, there may be no practical way of recovering the excess above the level ultimately approved.

To preserve the trust corpus, it was therefore necessary to stop lump-sum payments pending further order of the Court.

But to avoid subjecting retires to unnecessary hardship, the Court provided that "regular" pension payments at the levels provided by the SPP could be made, subject to recoupment of the excessive portion by reduction of future payments, with no waiver of the right of any retiree to elect a lump-sum or accelerated payment option during the period of the suspension and for thirty days thereafter.

Pogor, quite understandably, would like to "take the money and run" before it is finally decided whether there will be a reduction in the level of the payments. For the reasons stated, he cannot be permitted to do so. His motion for leave to intervene is granted only to permit filing of his motion for reconsideration. The latter motion is granted only to the extent that the Court has reconsidered the matter but is otherwise denied.

### SUMMARY

All of the motions are denied except to the extent indicated.

SO ORDERED.